Argued and submitted November 16, 2020, a peremptory writ of mandamus shall issue August 5, 2021

William COX
and Diosdada "Josie" Cox,
*Plaintiffs,*

*v.*

HP INC.,
dba HP Computing and Printing, Inc.,
a foreign corporation;
Charter Mechanical Contractors, Inc.,
dba Charter Mechanical,
an Oregon corporation; and
Spirax Sarco, Inc.,
a foreign corporation,
*Defendants.*

HP INC.,
dba HP Computing and Printing, Inc.,
*Third-Party Plaintiff-Adverse Party,*

*v.*

TÜV RHEINLAND OF NORTH AMERICA, INC.,
a foreign corporation,
*Third-Party Defendant-Relator,*

*and*

PROTON ENERGY SYSTEMS, INC.,
a foreign corporation,
*Third-Party Defendant.*

(CC 19CV14525) (SC S067138)

492 P3d 1245

After being sued for claims stemming from the explosion in Oregon of a hydrogen generator, HP, Inc. brought a contribution claim against TÜV Rheinland of North America, Inc. (TÜV), alleging that TÜV had negligently certified the design of the hydrogen generator, which HP had purchased from the hydrogen generator's Connecticut manufacturer. TÜV sought to dismiss the claim for lack of personal jurisdiction. After the trial court denied TÜV's motion, TÜV sought an alternative writ of mandamus, which this court issued; when the trial court declined to vacate its order, this court took up the question of whether Oregon may exercise specific personal jurisdiction over TÜV. *Held*: (1) Under *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 US ___, 141 S Ct 1017, 209 L Ed 2d 225 (2021), this court's prior holding in *Robinson v. Harley-Davidson Motor Co.*, 354 Or 572, 316 P3d 287 (2013), is disavowed to the extent that it requires

a but-for causal connection between a nonresident defendant's Oregon activities and the litigation in every case; (2) The court adheres to its conclusion in *Robinson* that, to satisfy the demands of due process, Oregon may exercise specific personal jurisdiction over a nonresident defendant only if the nature and quality of the defendant's Oregon activities permit a determination that it was reasonably foreseeable that the defendant would be sued in Oregon for the type of claim at issue and if the relationship among the defendant, Oregon, and the litigation otherwise comports with fair play and substantial justice; and (3) The relationship between TÜV's Oregon activities and this litigation is not sufficient to support personal jurisdiction because TÜV's Oregon activities involved limited efforts to reach Oregon manufacturers in need of testing and certification services, but this litigation stemmed from services TÜV performed elsewhere for a product unlike any that TÜV had previously certified in Oregon and for a manufacturer with no identified history of prior product sales in Oregon.

A peremptory writ of mandamus shall issue.


En Banc

Original proceeding in mandamus.*

William P. Taaffe, Smith Freed Eberhard PC, Portland, argued the cause and filed the brief for adverse party. Also on the brief was Sean K. Conner.

David W. Cramer, MB Law Group LLP, Portland, argued the cause and filed the briefs for relator. Also on the briefs was Jonathan M. Hoffman.

FLYNN, J.

A peremptory writ of mandamus shall issue.

_____

\* On petition for peremptory writ of mandamus from an order of Multnomah County Circuit Court, Jerry B. Hodson, Judge.

**FLYNN, J.**

This case requires us to revisit the requirements for Oregon to exercise specific personal jurisdiction in claims against an out-of-state defendant, in the wake of the United States Supreme Court's recent decision in *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 US ___, 141 S Ct 1017, 209 L Ed 2d 225 (2021). The action stems from the explosion of a hydrogen generator at the campus of HP, Inc., which severely injured plaintiff William Cox. After Cox and his wife filed suit against HP in an Oregon court, HP brought a third-party claim against relator, TÜV Rheinland of North America, Inc. (TÜV). HP alleged that TÜV—a Delaware company that tests and certifies products manufactured by others as conforming to established industry safety standards—had negligently certified the design of the generator at issue in this case. TÜV sought to dismiss HP's claim against TÜV for lack of personal jurisdiction. The trial court denied the motion to dismiss, and TÜV sought an alternative writ of mandamus, which this court allowed.

In the mandamus proceeding before us, there is no suggestion that TÜV has the kind of "continuous operations" within Oregon that are "so substantial and of such a nature" as to give rise to general personal jurisdiction.[1] *See Robinson v. Harley-Davidson Motor Co.*, 354 Or 572, 578, 316 P3d 287 (2013) (explaining the nature of general personal jurisdiction (internal quotation marks omitted)). But there also is no dispute that TÜV has some contacts with Oregon that might support the exercise of specific personal jurisdiction over TÜV in *some* case. That posture focuses the dispute in this case on the limits of what we have called the "relatedness" requirement of specific personal jurisdiction. *Id*. at 581. This court explored the requirement in *Robinson*,

---

[1] In the ordinary case, a corporation will be subject to general personal jurisdiction only in the state of its incorporation and the state of its principal place of business, but the Supreme Court has held open the possibility that in an "exceptional case," other operations in a forum "may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler AG v. Bauman*, 571 US 117, 139 & n 19, 134 S Ct 746, 187 L Ed 2d 624 (2014). Before the trial court, HP contended that it needed more discovery to determine if TÜV was subject to general jurisdiction in Oregon under the exceptional instance noted in *Daimler*, but HP does not advance that argument in this mandamus proceeding, and we do not address it.

ultimately concluding that the plaintiff's claims for negligent repair work performed in Idaho were not related to the Idaho defendant's only "relevant" Oregon activity—"generalized website promotions"—"in a manner that allows our courts to exercise specific jurisdiction." *Id.* at 595-96. And the Supreme Court explored the requirement in *Ford Motor Co.*, ultimately concluding that Ford's extensive activities in the forum states created a "relationship among the defendant, the forums, and the litigation" that was "close enough to support specific jurisdiction." 592 US at ___, 141 S Ct at 1032 (internal quotation marks and brackets omitted). But those cases arose in factual contexts at opposite ends of the spectrum, whereas this case falls in the uncharted middle.

Thus, the question in this case is whether there is a connection between TÜV's Oregon activities and HP's claim against TÜV that is sufficient to permit Oregon to exercise specific personal jurisdiction over TÜV. *See id.* (concluding that the connection between the plaintiffs' claims and the defendant's activities in the forum states was "close enough to support specific jurisdiction").[2] Ultimately, under the specific facts of this case, we conclude that Oregon lacks personal jurisdiction to resolve HP's claim against TÜV. Accordingly, we issue a peremptory writ of mandamus directing the trial court to dismiss the claim against TÜV.

## I. INTRODUCTION TO PERSONAL JURISDICTION

In a civil case, an Oregon court having subject matter jurisdiction also has jurisdiction over a properly served out-of-state defendant if the exercise of personal jurisdiction is authorized under ORCP 4, Oregon's "long-arm statute," and if the exercise of personal jurisdiction is compatible with the Due Process Clause of the Fourteenth Amendment

---

[2] *Robinson* refers almost interchangeably to the defendant's "contacts in Oregon" and the defendant's "activities in Oregon," and the discussion in *Ford Motor Co.* floats freely between references to the defendant's "[state]-based conduct," "[state] contacts," and "activities in" the state. *Robinson*, 354 Or at 596; *Ford Motor Co.*, 592 US at ___, ___, ___, ___, 141 S Ct at 1028, 1029, 1031, 1032. We take that linguistic fluidity as a reminder that there are no magic words to describe the concept that a defendant's contacts with a state may support an exercise of specific personal jurisdiction. For purposes of consistency, however, we will use the phrase "Oregon activities" to capture that concept.

to the United States Constitution.[3] *Robinson*, 354 Or at 576-77 (citing *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 US 915, 918, 131 S Ct 2846, 180 L Ed 2d 796 (2011), for the proposition that "[a] state court's assertion of jurisdiction exposes defendants to the State's coercive power, and is therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause"); ORCP 4 L. Among the bases on which ORCP 4 authorizes personal jurisdiction is a "catchall provision under ORCP 4 L that confers jurisdiction to the extent permitted by due process."[4] *Robinson*, 354 Or at 576-77. Accordingly, our inquiries under ORCP 4 L and the Due Process Clause collapse into one. In that inquiry, "this court is guided by decisions of the Supreme Court of the United States regarding the constitutionality of [a court's] exercise [of personal jurisdiction] under the Due Process Clause of the Fourteenth Amendment." *State ex rel Circus Circus Reno, Inc. v. Pope*, 317 Or 151, 156, 854 P2d 461 (1993); *accord Robinson*, 354 Or at 577.

As we explained in *Robinson*, under Supreme Court precedent, a state's exercise of personal jurisdiction over a nonresident defendant "comports with due process" if sufficient contacts exist "between the defendant and the forum state such that maintaining suit in the state would 'not offend traditional notions of fair play and substantial justice.'" 354 Or at 577-78 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 291-92, 100 S Ct 559, 62 L Ed 2d 490 (1980)). Another way of articulating the rule is that due process is "satisfied if 'the defendant's conduct and connection with the forum State are such that he [or she] should reasonably anticipate being haled into court there.'" *Id.* at 578 (quoting *World-Wide Volkswagen*, 444 US at 297 (brackets in *Robinson*)). For those defendants whose contacts with

---

[3] The Due Process Clause provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law * * *." US Const, Amend XIV, § 1.

[4] ORCP 4 L confers personal jurisdiction "where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States." Because TÜV identifies no state constitutional limit applicable in this case, the question becomes whether due process permits an exercise of personal jurisdiction over TÜV in this case. *See Barrett v. Union Pacific Railroad Co.*, 361 Or 115, 119, 390 P3d 1031 (2017) (where defendant identified no state constitutional limit, narrowing the question to address due process limits on personal jurisdiction).

Oregon are not "so substantial" as to give rise to so-called "general jurisdiction," which would permit Oregon to exercise personal jurisdiction over the defendant even "on causes of actions arising from dealings entirely distinct from" the defendant's Oregon activities, those Oregon contacts nevertheless may permit the state to exercise personal jurisdiction over the defendant in a specific case before it. *Id.* at 578-79 (internal quotation marks omitted). Specific jurisdiction "covers defendants less intimately connected with a State [than does general jurisdiction], but only as to a narrower class of claims." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1024.

As set out above, the issue in this mandamus proceeding is whether the demands of due process permit Oregon to exercise *specific* personal jurisdiction—also called "case-linked" jurisdiction. *See id.* (explaining that specific jurisdiction is sometimes called "case-linked" jurisdiction). The justification for permitting a state to exercise specific personal jurisdiction is rooted in the principle that, when a nonresident defendant engages in business activity in the forum state, it is "reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which appellant has incurred there." *Internat. Shoe Co. v. Washington*, 326 US 310, 320, 66 S Ct 154, 90 L Ed 95 (1945) (allowing the State of Washington to enforce unemployment insurance fund obligations against a nonresident defendant doing business through employees working in the state).

## II.   BACKGROUND OF THIS CASE

The primary claims in this case are those filed by Cox and his wife against HP after Cox was severely injured in the explosion of a Proton H Series Hydrogen Generator, a piece of equipment manufactured by Proton Energy Systems, Inc. in Connecticut.[5] HP had purchased the hydrogen generator from Proton for use at the HP Corvallis campus. Plaintiffs brought several claims against HP, alleging that HP had made changes to Proton's generator that had

---

[5] A hydrogen generator is a highly technical piece of equipment that generates hydrogen by converting water to hydrogen and oxygen.

rendered it unsafe. HP, in turn, filed a third-party claim for contribution against TÜV.[6]

TÜV is a nationally recognized testing laboratory (NRTL), meaning that it has been officially approved by the United States Occupational Safety and Health Administration (OSHA) to perform independent testing of equipment and materials that will be used in a workplace and to certify that they conform to established industry safety standards. *See* 29 CFR § 1910.7 (2020) (defining and setting out requirements for nationally recognized testing laboratories). TÜV had been retained by Proton to evaluate and certify the design of the H Series Hydrogen Generator as in conformance with applicable industry safety standards,[7] and TÜV performed that work at Proton's facility in Connecticut. In HP's third-party claim for contribution, it alleged that Proton had designed the hydrogen generator to contain a component part that was defective or otherwise not suitable for use with a combustible fluid like hydrogen; that, despite the defect, TÜV had certified the Proton generator "as meeting applicable standards for the operation of hydrogen generators" of that type; and that, in doing so, TÜV had been negligent and a cause of the injuries that plaintiffs had alleged.

TÜV responded to the third-party complaint by filing a motion to dismiss the claim against it for lack of personal jurisdiction. It supported the motion with a declaration asserting that TÜV is incorporated in Delaware and has its principal place of business in Massachusetts; that its connection to the generator at issue was limited to inspecting and certifying Proton's design of the H Series hydrogen generator; that the work consisted of evaluating one sample unit and then conducting regular inspections of Proton's factory to ensure product consistency; and that the work was all performed in Connecticut. The declaration also asserted that TÜV had not inspected or tested the particular unit

---

[6] Plaintiffs also brought claims against two other defendants; HP also filed third-party claims against Proton Energy Systems, Inc. None of those claims are at issue here.

[7] TÜV certified the generator as in conformance with ISO Standard 22734-1:2008, for Hydrogen Generators Using Water Electrolysis Process. ISO is the short-form name of the International Organization for Standardization.

that reached HP in Oregon or even been aware of the sale to HP and that TÜV has not performed any testing or certification work in Oregon "relating to generators of any kind." Given those facts, TÜV argued, Oregon lacks a basis to exercise specific personal jurisdiction over TÜV in this case.

In opposing the motion, HP did not dispute any of TÜV's factual assertions, but it offered evidence that TÜV had previously engaged in other Oregon activities in an effort to obtain Oregon clients for its product testing and certification services and that TÜV had had previously performed those services for HP in Oregon. HP also offered evidence that it was influenced in its decision to purchase the hydrogen generator that TÜV had certified for Proton by HP's familiarity with TÜV's qualifications to perform product certifications. Thus, HP argued that TÜV's Oregon activities created a case-specific link to the present litigation that is sufficient to permit Oregon to exercise specific personal jurisdiction over TÜV.

To support its argument, HP offered a copy of a 2006 announcement on TÜV's website in which TÜV described itself as "a world leader in compliance testing and certification, management system auditing and certification, field evaluation services, and consumer product services," announced that it had "expanded the staff at its Portland, Oregon, office" and emphasized that it "remain[ed] committed to providing a complete menu of compliance and auditing services to [its] customers throughout the area." HP also offered declarations from HP employees who asserted that TÜV had obtained approvals from the State of Oregon to perform evaluation and testing services and had "regularly conduct[ed] certification of HP products within the State of Oregon." One of the declarations asserted that, without "listing or labeling by a State of Oregon approved NRTL, HP would not have purchased and/or used the Generator at issue." It also asserted that, based on HP's preexisting relationship with TÜV, HP's awareness of TÜV's status as an NRTL and an Oregon-approved Field Evaluation Firm, and "TÜV's representations about its qualifications to serve as an NRTL for safety testing and certification, HP believed that it could rely on TÜV's certifications of the hydrogen generator at issue in this case."

As set out above, the trial court denied TÜV's motion to dismiss, and TÜV filed a petition for an alternative writ of mandamus, which this court allowed. When the trial court declined to vacate its order denying the motion, this court took up the question of whether Oregon may exercise specific personal jurisdiction over TÜV in this case.

## III.  DISCUSSION

Eight years ago, this court in *Robinson* set out a comprehensive framework for analyzing whether a particular claim is one in which Oregon may exercise specific personal jurisdiction over a nonresident defendant. 354 Or at 594. The parties have offered competing analyses of where this case falls under the *Robinson* framework. After we received briefing and heard argument, the United States Supreme Court issued its opinion in *Ford Motor Co.*, which illuminates a key aspect of the test for specific personal jurisdiction. The parties then submitted supplemental briefing to address the impact of the *Ford Motor Co.* decision on our *Robinson* framework and on the exercise of personal jurisdiction under the particular circumstances of this case. Before considering how *Ford Motor Co.* affects our analysis and resolution of this case, we turn first to an overview of the *Robinson* framework.

A.  Robinson's *Analytical Framework for Issues of Personal Jurisdiction*

We described in *Robinson* "three inquiries"—or requirements—that govern "whether specific jurisdiction exists." 354 Or at 579. First, the court must determine that the defendant has "'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'" *Id.* (quoting *Hanson v. Denckla*, 357 US 235, 253, 78 S Ct 1228, 2 L Ed 2d 1283 (1958) (brackets in *Robinson*)). Next, the court must determine that the litigation "'arise[s] out of or relate[s] to' the foreign defendant's 'activities in the forum State.'" *Robinson*, 354 Or at 579 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 US 408, 414, 104 S Ct 1868, 80 L Ed 2d 404 (1984); *Burger King Corp. v. Rudzewicz*, 471 US 462, 472, 105 S Ct 2174, 85 L Ed 2d 528 (1985)). Finally, the court must determine that the exercise of jurisdiction over the "defendant comports with fair play and substantial justice."

*Robinson*, 354 Or at 580 (citing *Asahi Metal Industry Co. v. Superior Court*, 480 US 102, 113, 107 S Ct 1026, 94 L Ed 2d 92 (1987); *Burger King*, 471 US at 476-77). A court may exercise specific personal jurisdiction only if all three requirements are satisfied. *Robinson*, 354 Or at 579-80.

Although the defendant in *Robinson* contended that its connection to Oregon did not satisfy even the threshold requirement of "purposeful availment," the opinion limited its discussion to the second inquiry—which this court referred to as the "relatedness" inquiry. *Id.* at 580-81. At the time that this court decided *Robinson*, the Supreme Court had offered little guidance regarding the scope of the "relatedness" inquiry, instead leaving it to the "lower courts to determine, on a fact-intensive basis, whether the strength of that nexus in particular cases is sufficient to comport with due process." *Id.* at 581-82. Against that backdrop, this court in *Robinson* addressed the open question of how to assess whether the litigation could be said to "arise out of or relate to" the defendant's Oregon activities. *Id.* at 582. We explained that, in the absence of a clear analytical framework from the Supreme Court, "some lower federal courts and state courts * * * have adopted various approaches to test the sufficiency of forum contacts." *Id.* We analyzed four different tests that courts elsewhere were employing to assess the nexus between a specific claim and the defendant's contacts with the forum state, and we rejected all but one. *Id.*

First, we rejected the "substantive relevance" test, also called the "proximate cause" test, under which "at least one of a defendant's contacts with the forum [must] be relevant to the merits of a plaintiff's claim." *Id.* at 582, 587. In doing so, we reasoned that the test, though predictable, was "mechanical and rigid" and "too severely limit[ed] this state's ability to advance its interest in adjudicating the disputes of its residents in instances in which personal jurisdiction may properly be exercised." *Id.* at 587. Second, we rejected the simple "but-for" test, which requires only that the plaintiff's "claim would not have arisen 'but for' the defendant's forum-related activities." *Id.* at 588. We reasoned that that approach was "overinclusive" and "pa[id] too much regard to the state's interest in adjudicating disputes and too little regard to whether litigation in a forum state

is reasonably foreseeable by a nonresident defendant." *Id*. at 589-90. Third, we rejected the flexible "substantial connection" test, under which "[t]he degree of relatedness required in a given case is inversely proportional to the overall intensity of the defendant's forum contacts." *Id*. at 590 (internal quotation marks and brackets omitted). We reasoned that that flexible test tended to "conflate[] the separate analyses required for general and specific jurisdiction." *Id*. at 591.

Ultimately, *Robinson* adopted a "but-for and foreseeability of litigation test" as "most consistent with the due process principles established by the Supreme Court in the area of personal jurisdiction." *Id*. at 594. Under that test, when a defendant has "purposefully directed its activities at this state," those activities "must be a but-for cause of the litigation and provide a basis for an objective determination that the litigation was reasonably foreseeable." *Id*. Drawing extensively on the reasoning in a Third Circuit decision, we explained that, by requiring a but-for causal link between a defendant's Oregon activities and the plaintiff's claim, the test provides a threshold standard for establishing the requisite connection. *Id.* at 591 (discussing *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F3d 312, 322-23 (3d Cir 2007)). If that threshold is met, a court must "then also analyze the defendant's contacts to objectively assess the foreseeability of the pending litigation." *Robinson*, 354 Or at 591. We emphasized the reasoning of the *O'Connor* court that "'[t]he animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable.'" *Robinson*, 354 Or at 592 (quoting *O'Connor*, 496 F3d at 322). We thus held in *Robinson* that, in every case, litigation will be sufficiently related to a defendant's Oregon activities only if "at least one" of those activities is a "but-for cause of the litigation" and also "provide[s] a basis for an objective determination that the litigation was reasonably foreseeable." *Id*. at 594. We emphasized, however, that causation and foreseeability are not enough; in addition, "the exercise of jurisdiction must otherwise comport with fair play and substantial justice." *Id*. We also cautioned that the approach to "relatedness" that we had adopted was "not definitive and may someday be further clarified by the Supreme Court." *Id*.

B.  *Further Clarification from the Supreme Court*

Since this court's decision in *Robinson*, the United States Supreme Court has decided two specific jurisdiction cases that provide the further clarification that *Robinson* foreshadowed: *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 582 US ___, 137 S Ct 1773, 198 L Ed 2d 395 (2017); and *Ford Motor Co.*, 592 US ___, 141 S Ct 1017.[8]

1.  Bristol-Myers

*Bristol-Myers* is the first case in which the United States Supreme Court directly explored the relatedness requirement. A group of plaintiffs had sued Bristol-Myers Squibb in California, alleging that a drug made by the company, Plavix, had injured them. *Bristol-Myers*, 582 US at ___, 137 S Ct at 1778. Some of the plaintiffs were residents of other states, and Bristol-Myers Squibb challenged California's exercise of specific personal jurisdiction over the claims of those out-of-state plaintiffs. *Id.* at ___, 137 S Ct at 1778. Bristol-Myers Squibb had extensive connections with California, including operating five research and laboratory facilities, employing hundreds of sales representatives, and selling over 100 million Plavix pills within the state. *Id.* at ___, 137 S Ct at 1778. But the company had not developed or produced Plavix in California, and the out-of-state plaintiffs had not been prescribed Plavix in California, purchased Plavix in California, ingested Plavix in California, or been injured by Plavix in California. *Id.* at ___, ___, 137 S Ct at 1778, 1781. Under those circumstances, the Court concluded, the connection been California and the claims of the out-of-state plaintiffs was too weak to permit the exercise of specific personal jurisdiction. *Id.* at ___, 137 S Ct at 1782.

*Bristol-Myers* emphasizes the importance of an "adequate link between the State and the *** claims" at

---

[8] Also since *Robinson*, the Supreme Court addressed specific jurisdiction in *Walden v. Fiore*, 571 US 277, 134 S Ct 1115, 188 L Ed 2d 12 (2014). *Walden* does not directly inform our relatedness analysis, however, because it turned on whether the defendant's single connection to the forum satisfied the "purposeful availment" requirement; as a result, the Court in *Walden* "had no occasion to address the necessary connection between a defendant's in-state activity and the plaintiff's claims." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1031.

issue. *Id.* at ___, 137 S Ct at 1781. In its opinion below, the California Supreme Court had employed a "sliding scale approach" to specific personal jurisdiction, under which a weak connection between the forum and the specific claims could be overlooked if the defendant had other contacts with the forum state that were extensive but unrelated to the specific claims. *Id.* at ___, 137 S Ct at 1781. The Court rejected that approach as a "loose and spurious form of general jurisdiction" in that it rested only on general connection between the defendant and the forum. *Id.* at ___, 137 S Ct at 1781. The approach of the California Supreme Court had been similar to the flexible "substantial connection" test for "relatedness" that this court rejected in *Robinson*. Thus, we take the Supreme Court's conclusion in *Bristol-Myers* as an indication that we correctly rejected the "substantial connection" test in *Robinson* as tending to "conflate[] the separate analyses required for general and specific jurisdiction." *Robinson*, 354 Or at 590-91. For specific personal jurisdiction, *Bristol-Myers* emphasizes, there always must be an "adequate link between" the state and the specific claims at issue. 582 US at ___, 137 S Ct at 1781. Thus, it was not "sufficient—or even relevant—that [Bristol-Myers Squibb] conducted research in California on matters unrelated to Plavix" when there was not "a connection between the forum and the specific claims at issue." *Id.* at ___, 137 S Ct at 1781.

    2.   Ford Motor Co.

      In *Ford Motor Co.*, the Court once again directly addressed the "relatedness" requirement. In each of two consolidated cases before the Court, the plaintiff was a resident of the forum state and was injured in a crash of an allegedly defective Ford vehicle within the forum state. 592 US at ___, 141 S Ct at 1022-23. Also in each case, the vehicle involved in the crash had been designed, manufactured, and sold by Ford outside of the forum state. *Id.* at ___, 141 S Ct at 1023. But Ford also engaged in extensive and ongoing activity in the forum states that included marketing, selling, maintaining, and repairing new and used Ford vehicles in the forum states—including the models of vehicle that had injured the two plaintiffs. *Id.* at ___, 141 S Ct at 1028. The courts in both Montana and Minnesota had determined

that Ford's activities in their states were sufficiently related to the plaintiffs' claims to permit the exercise of specific personal jurisdiction over Ford, but Ford disagreed. *Id.* at ___, 141 S Ct at 1023-24.

In addressing Ford's challenges to the exercise of personal jurisdiction, *Ford Motor Co.* describes a less rigid analytical structure than the "three inquiries" that this court articulated in *Robinson*, but the Supreme Court ultimately emphasized the same constitutional considerations and the same body of Supreme Court precedent that this court relied on in *Robinson*. As a threshold requirement, the Court explained, there must be a relationship between the defendant and the forum state—a relationship that the Court has described as requiring that the defendant "take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1024-25 (quoting *Hanson*, 357 US at 253 (brackets in *Ford Motor Co.*)). "Yet even then," the Court emphasized, "the forum State may exercise jurisdiction in only certain cases"—a limitation that the Court has "often stated" as a requirement that the claims "must arise out of or relate to the defendant's contacts with the forum." *Id.* at ___, 141 S Ct at 1025 (internal quotation marks omitted). The Court described those two requirements as rules that "derive from and reflect two sets of values—treating defendants fairly and protecting interstate federalism." *Id.* (internal quotation marks omitted). As the Court explained, the concept of specific jurisdiction is founded "on an idea of reciprocity between a defendant and a State" such that "[w]hen (but only when) a company 'exercises the privilege of conducting activities within a state'—thus 'enjoy[ing] the benefits and protection of [its] laws'—the State may hold the company to account for related misconduct." *Id.* (quoting *Internat. Shoe Co.*, 326 US at 319 (brackets in *Ford Motor Co.*)).

The analysis in *Ford Motor Co.*—as must our analysis here—focuses on the case-specific aspect of specific jurisdiction: what the Due Process Clause requires for a state to exercise jurisdiction in a specific case over a defendant whose contacts with the forum undisputedly are

sufficient to satisfy the threshold requirement for an exercise of personal jurisdiction in some cases. *See id.* at ___, 141 S Ct at 1031 (explaining that "Ford has a veritable truckload of contacts with Montana and Minnesota, as it admits," and that "[t]he only issue is whether those contacts are related enough to the plaintiffs' suits"). Ford had insisted that its activities in the forum states could not support the exercise of specific personal jurisdiction because the particular claims lacked a causal link to those activities. *Id.* at ___, ___, 141 S Ct at 1023, 1026.

The Court rejected Ford's argument. *Id.* at ___, 141 S Ct at 1026. Pointing to its common formulation of the second requirement—that the claims must "arise out of *or relate to* the defendant's contacts with the forum"—the Court explained: "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* (internal quotation marks omitted, emphasis in original). The Court emphasized that there was "a strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction"— and that personal jurisdiction "in cases like these" should not "ride on the exact reasons for an individual plaintiff's purchase, or on his ability to present persuasive evidence about them." *Id.* at ___, ___, 141 S Ct at 1028, 1029 (internal quotation marks omitted). And the Court put an end to any misimpression that, in *Bristol-Myers*, the Court's rejection of specific personal jurisdiction had turned on the lack of a direct causal link between Bristol Myers' sales of Plavix in California and the out-of-state purchases of Plavix by the out-of-state plaintiffs. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1030-31. The Court explained that it had "found jurisdiction improper in *Bristol-Myers* because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1031. Accordingly, the Court concluded that the standard will not "always requir[e] proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Id.* at ___, 141 S Ct at 1026. The Court emphasized, however, that asking only if the plaintiff's claims "relate to" the defendant's forum activities "does

not mean anything goes"; rather the requirement "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

The analysis in *Ford Motor Co.* provides some guidance as to those "real limits" that "protect defendants foreign to a forum." *Id.* First, after reviewing several of its prior cases, the Court explained that Ford's forum activities in the cases before it matched what the Court called a "paradigm case of specific jurisdiction"— an auto manufacturer that has deliberately served a market for its vehicles in a forum state being sued for a claim alleging that one of those vehicles was defective, that it injured a forum resident, and that the injury occurred in the forum state. *Id.* at ___, 141 S Ct at 1027-28 (citing *World-Wide Volkswagen*, 444 US at 297; *Daimler AG v. Bauman*, 571 US 117, 127 n 5, 134 S Ct 746, 187 L Ed 2d 624 (2014)).

Next, the Court detailed the extensive and ongoing business activities that Ford regularly conducted in the forum states: Ford urged residents of the forum states to buy Ford vehicles, including the same models of vehicle that injured the plaintiffs, "by every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail"; Ford sold both new and used versions of its vehicles, including the two models at issue, through dozens of Ford dealerships in each state; and Ford "work[ed] hard to foster ongoing connections to its cars' owners" in each state through activities that "make Ford money," like maintaining, repairing, and supplying replacement parts for Ford vehicles in the forum states. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1028.

Turning to the relationship between Ford's activities in the forum states and the specific claims before it, the Court emphasized that "Ford had systematically served a market in Montana and Minnesota for the very vehicles" that, the plaintiffs alleged, had "malfunctioned and injured them in those States." *Id.* As the Court reasoned, "[t]hose contacts might turn any resident of [the forum states] into a Ford owner—even when he buys his car from out of state." *Id.* at ___, 141 S Ct at 1029. In other words, despite the absence

of a but-for causal relationship between Ford's activities in the forum states and the claims of the particular plaintiffs, Ford's activities had created a strong possibility of causing some forum resident to purchase and be injured by the same allegedly defective model of vehicle.[9] *See id.* (emphasizing that the "possibilities" for a causal link, which were "created by the reach of Ford's" activities in the forum states, "underscore[d] the aptness of finding jurisdiction").

Finally, the Court added, "allowing jurisdiction in these cases treats Ford fairly" because, "[i]n conducting so much business in Montana and Minnesota, Ford 'enjoys the benefits and protection of [their] laws'—the enforcement of contracts, the defense of property, the resulting formation of effective markets." *Id.* at ___, 141 S Ct at 1029-30 (quoting *Internat. Shoe Co.*, 326 US at 319 (second brackets in *Ford Motor Co.*)). All of that assistance from the forum states, the Court explained, created "reciprocal obligations," including "that the car models Ford so extensively markets in [the forum states] be safe for their citizens to use there." *Id.* at ___, 141 S Ct at 1030. Moreover, as an automaker "regularly marketing" the vehicles in the forum states, Ford had "'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless where it was first sold)." *Id.* (quoting *World-Wide Volkswagen*, 444 US at 297). Ultimately, under all of the circumstances that it identified, the Court concluded that the "relationship among the defendant, the forums, and the litigation" was "close enough to support specific jurisdiction." *Id.* at ___, 141 S Ct at 1032 (internal quotation marks and brackets omitted).

## C.   *How* Ford Motor Co. *Alters Our* Robinson *Framework for Analyzing Personal Jurisdiction*

In light of *Ford Motor Co.*, we understand *Robinson* to have adopted an unduly narrow test for whether an

---

[9] In a concurring opinion, Justice Alito emphasized that he would "infer" a causal link under the circumstances and that he viewed that kind of "rough causal connection" as the "real limits" on whether litigation can be said to "relate to" the defendant's forum activities. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1033-34 (Alito, J., concurring in the judgment) (internal quotation marks omitted).

exercise of specific personal jurisdiction over a defendant is consistent with the Due Process Clause. We do not question our conclusion in *Robinson* that a but-for causal link to a defendant's Oregon activities combined with reasonable fore-seeability of the litigation may demonstrate the relationship that due process requires, but we recognize now that our test can be underinclusive. As *Ford Motor Co.* makes clear, due process will not "*always* requir[e] proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct." 592 US at ___, 141 S Ct at 1026 (emphasis added). There will be at least some cases in which the "relationship among the defendant, the forums, and the litigation" is "close enough to support specific juris-diction" in the absence of a but-for causal link. *Id.* at ___, 141 S Ct at 1032 (internal quotation marks and brackets omitted). Thus, to the extent that *Robinson* requires a but-for causal link in *every* case to satisfy the requirement that an action "arise out of or relate" to a nonresident defendant's Oregon activities, we disavow that aspect of our holding.

We continue to adhere, however, to our conclusion that a case will "arise out of or relate to" the defendant's connection to Oregon only if the defendant's Oregon activi-ties "provide a basis for an objective determination that the litigation was reasonably foreseeable." *Robinson*, 354 Or at 594 (internal quotation marks omitted). Nothing about the Court's analysis in *Ford Motor Co.* calls into question that Court's prior assertions that the concept of foreseeability is "'critical to due process analysis.'" *See, e.g.*, *Burger King*, 471 US at 474 ("'the foreseeability that is critical to due process analysis *** is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there'" (quoting *World-Wide Volkswagen*, 444 US at 297 (ellipsis in *Burger King*))).

Indeed, although the Court did not use the labels "foreseeability" or "quid pro quo" in *Ford Motor Co.*, much of the Court's reasoning aligns with this court's emphasis in *Robinson* that "'[t]he animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable.'" *Robinson*, 354 Or at 592 (quoting *O'Connor*, 496 F3d at 322). For example, the Court emphasized that the "'benefits and

protection'" that the forum states' laws provide for Ford's extensive business activity in the states create "reciprocal obligations." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1029-30 (quoting *Internat. Shoe Co.*, 326 US at 319). Further, the Court reasoned that "[a]n automaker regularly marketing a vehicle in a State *** has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless where it was first sold)." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1030 (quoting *World-Wide Volkswagen*, 444 US at 297). Finally, the Court emphasized that the exercise of jurisdiction over such a defendant is "predictable—and thus allows [the defendant] to 'structure [its] primary conduct' to lessen or even avoid the costs of state-court litigation." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1030 (quoting *World-Wide Volkswagen*, 444 US at 297 (second brackets in *Ford Motor Co.*)). Specifically, the Court noted, a defendant "could 'act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are [still] too great, severing its connection with the State.'" *Id.* at ___, 141 S Ct at 1027 (quoting *World-Wide Volkswagen*, 444 US at 297 (brackets in *Ford Motor Co.*)).

We thus continue to rely on the concept of reasonable foreseeability as a useful measure of whether a relationship is "close enough" to support the exercise of specific personal jurisdiction. And we adhere to our conclusion in *Robinson* that, for Oregon courts to exercise specific jurisdiction, the "nature and quality" of the "nonresident defendant's activities in this state" must "be such that the litigation is reasonably foreseeable." 354 Or at 594. We also adhere to our conclusion that the exercise of specific personal jurisdiction "must otherwise comport with fair play and substantial justice."[10] *Id.*

To reiterate, if a defendant is not "essentially at home" in Oregon such that it is subject to general jurisdiction

_____

[10] Arguably, the analysis in *Ford Motor Co.* suggests that the inquiry into whether a state's exercise of jurisdiction comports with fair play and substantial justice is incorporated into the question of whether the relationship is "close enough" to support the exercise of specific personal jurisdiction, rather than the independent, third inquiry that we specified in *Robinson. See* 354 Or at 579 (identifying "three inquiries"). We consider it in that context below, but the analytical distinction—if any—has no bearing on the case before us.

in Oregon, then an Oregon court's exercise of personal jurisdiction over that defendant is constitutionally limited to a "narrow[] class of claims." *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1024 (internal quotation marks omitted). To satisfy the demands of due process, the defendant first must have a minimum relationship with Oregon, which the Court repeatedly has described as being established when the defendant takes "'some act by which [it] purposefully avails itself of the privilege of conducting activities within'" Oregon. *Id.* at ___, 141 S Ct at 1024-25 (quoting *Hanson*, 357 US at 253 (brackets in *Ford Motor Co.*)); *accord Robinson*, 354 Or at 579 (same).

In addition, there must be a relationship between the defendant's activities in the state and the particular claims—commonly described as a requirement that the plaintiff's claims "'must arise out of or relate to the defendant's contacts' with the forum" state. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1025 (quoting *Bristol-Myers*, 582 US at ___, 137 S Ct at 1780); *accord Robinson*, 354 Or at 579 (quoting *Helicopteros*, 466 US at 414). At a minimum, to satisfy that requirement, the "nature and quality" of the defendant's Oregon activities must permit a determination that it was "reasonably foreseeable" that the defendant would be sued in Oregon for the type of claim at issue. *Robinson*, 354 Or at 594. Moreover, "the exercise of jurisdiction must otherwise comport with fair play and substantial justice." *Id.*; *see also Ford Motor Co.*, 592 US at ___, 141 S Ct at 1029-30 (emphasizing that an automaker engaged in forum activities like Ford's has "clear notice that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless where it was first sold)" (internal quotation marks omitted)). As the Supreme Court cautioned in *Ford Motor Co.*, whatever inquiry is used to determine whether a particular claim arises out of or relates to the defendant's activities in the state, the test "incorporates real limits, as it must to adequately protect defendants foreign to a forum." 592 US at ___, 141 S Ct at 1026.

## IV.   APPLICATION

We turn now to the question of whether the "relationship among" TÜV, Oregon, and the present litigation

is "close enough to support specific jurisdiction." *See Ford Motor Co.*, 592 US at ___, 141 S Ct at 1032 (internal quotation marks omitted). We emphasize that there is no reason to doubt that TÜV has purposefully availed itself of the privilege of conducting some business activity in Oregon. Nevertheless, the essence of specific jurisdiction is that it "covers defendants who are less intimately connected with a State [than those subject to general jurisdiction], but only as to a narrower class of claims." *Id.* at ___, 141 S Ct at 1024. To determine if HP's claim falls within that class, we must consider whether there also is a relationship between TÜV's Oregon activities and the present litigation that makes it reasonably foreseeable and otherwise consistent with "fair play and substantial justice" for TÜV to be haled into court in Oregon to defend against HP's claim. *See Robinson*, 354 Or at 577-78 (internal quotation marks omitted).

In analyzing that constitutional question, "we consider the facts as alleged in [the pleadings], any relevant supporting affidavits, and other evidence submitted by the parties." *Robinson*, 354 Or at 576 (citing *Willemsen v. Invacare Corp.*, 352 Or 191, 195 n 2, 282 P3d 867 (2012), *cert den*, 568 US 1143, 133 S Ct 984, 184 L Ed 762 (2013)); *see also* ORCP 21 A (providing that, in considering a motion to dismiss for lack of personal jurisdiction, a trial court may rely on the pleadings, affidavits, declarations, and other evidence). We assume that the facts alleged in HP's third-party "complaint are true and construe any disputed facts consistently with the trial court's ruling."[11] *Barrett v. Union Pacific Railroad Co.*, 361 Or 115, 117 n 1, 390 P3d 1031 (2017) (citing *Willemsen*, 352 Or at 195 n 2). Here, HP's complaint contains virtually no allegations pertinent to jurisdiction over TÜV, so we focus on the factual record. We ultimately conclude that the record does not establish a basis for Oregon to

---

[11] In this litigation, HP is a defendant and a third-party plaintiff, and TÜV is a third-party defendant. A claim between a third-party plaintiff and third-party defendant is analyzed the same way as any claim between a plaintiff and defendant for purposes of determining personal jurisdiction. *See Asahi*, 480 US at 106, 108-16 (analyzing whether personal jurisdiction over the third-party defendant in the third-party plaintiff's claim would comport with due process using the same framework). For purposes of our personal jurisdiction discussion, the "plaintiff" is HP and the "defendant" is TÜV.

exercise specific jurisdiction over TÜV in this case, but we acknowledge that it is a close question.

We turn first to HP's argument, raised in its supplemental briefing, that we need look no further than the facts of *Ford Motor Co.* to conclude that Oregon has jurisdiction over TÜV in this case. HP emphasizes that the litigation has a significant relationship to Oregon: "the hydrogen generator certified by TÜV was used in Oregon, exploded in Oregon, and caused damages \*\*\* in Oregon." According to HP, that connection between Oregon and the litigation makes this case "highly analogous to *Ford* [*Motor Co.*]" and supports an exercise of personal jurisdiction over TÜV. The analogy to *Ford Motor Co.* is of limited value, however. Oregon's connection to HP's claims may eliminate the specter of "forum-shopping," which is a consideration that *Ford Motor Co.* emphasized in distinguishing *Bristol-Meyers*. *Ford Motor Co.*, 592 US at ___, 141 S Ct at 1031. But, as *Ford Motor Co.* reiterates, "the 'essential foundation' of specific jurisdiction" is "a strong 'relationship among *the defendant*, the forum, and the litigation.'" *Id.* at ___, 141 S Ct at 1028 (quoting *Helicopteros*, 466 US at 414 (emphasis added)). In short, the Court in *Ford Motor Co.* did not end its due process inquiry with the fact that the product at issue caused injury to forum residents in the forum states, and neither can we.

In *Ford Motor Co.*, the "strong relationship" consisted of extensive and ongoing activity in the forum states that "might turn any resident of [the forum states] into a Ford owner"—urging residents of the forum states "[b]y every means imaginable" to purchase Ford vehicles, including vehicles identical to the models that the plaintiffs had purchased; selling both new and used versions of those vehicles to forum residents through dozens of Ford dealerships in each state; and maintaining ongoing connections to Ford owners in each state by repairing and maintaining their Ford vehicles. *Id.* at ___, 141 S Ct at 1028-29 (internal quotation marks omitted). Thus, *Ford Motor Co.* represented a "paradigm example \*\*\* of how specific jurisdiction works." *Id.* at ___, 141 S Ct at 1028. But this case is different. There is no evidence that TÜV sold hydrogen generators to Oregon businesses; there is no evidence that it urged Oregon residents to buy hydrogen generators; and there is no evidence

that TÜV performed any work on hydrogen generators after they had been purchased by Oregon residents.

HP's analogy to *Ford Motor Co.* does not allow us to avoid what *Robinson* describes as the "fact-intensive" inquiry into whether the "nexus" in this particular case between the litigation and the defendant's Oregon activities "is sufficient to comport with due process." *Robinson*, 354 Or at 581-82. So we turn now to that inquiry. We explained in *Robinson* that a relationship that is close enough to permit the exercise of specific personal jurisdiction requires that the defendant's "conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *Id.* at 578 (internal quotation marks omitted). *Ford Motor Co.* makes clear that we correctly required that nexus to be found in the defendant's Oregon activities. *Robinson*, 354 Or at 594; *see Ford Motor Co.*, 592 US at ___, 141 S Ct at 1025 (emphasizing that the litigation "must arise out of or relate to the defendant's contacts with the forum" (internal quotation marks omitted)). Here, HP has provided evidence of TÜV's Oregon activities and argues that the nexus between those activities and the present litigation is close enough to permit the exercise of specific personal jurisdiction. Before assessing that asserted nexus, however, we examine those Oregon activities in more detail.

Beginning with what could be a particularly significant contact with Oregon, HP asserts that TÜV has gained approval from the State of Oregon as a Field Evaluation firm and as an "Oregon approved NRTL." We emphasize that the record contains very little information about the meaning of those approvals.[12] Nevertheless, TÜV agreed at oral argu-

---

[12] Evidence in the form of a web page from federal OSHA describes the national NRTL program for identifying testing laboratories that possess the necessary capability to test and certify products as satisfying the standards established by various industry-based associations. The document indicates that states have the option to adopt state-specific programs for recognizing testing laboratories and certifying bodies. HP does not argue that Oregon has adopted a separate testing and certification program for "Oregon NRTLs," and the relevant law indicates that it has not. *See* OAR 437-002-0005(7) (incorporating by reference the federal OSHA NRTL program); OAR 437-002-0007 ("By adopting these rules, the Department [of Consumer and Business Services] does not establish a testing and certification program separate from the federal OSHA Testing and Certification Program.").

ment in this court that the approvals generally allow it to assess and certify products within this state and, at least as to the field evaluator status, the governing law appears to support that understanding. *See generally* ORS 479.610 (requiring certification of electrical products for installation in connection with a business); ORS 479.760(2) (allowing for certification of electrical products meeting safety standards as shown by many methods, including "evaluation by an approved field evaluation firm").

Also potentially significant is the evidence that—at least in 2006—TÜV was staffing a Portland office and was promoting its services in Oregon. In a posting on its website, TÜV described itself as "a world leader in compliance testing and certification, management system auditing and certification, field evaluation services, and consumer product services" and emphasized that it was "committed to providing a complete menu of compliance and auditing services to [its] customers throughout" several northwestern states, including Oregon. In addition, the record includes a posting on TÜV's website that promotes one seminar to be offered by TÜV at a Portland location on the topic of robot safety.[13] Finally, HP has provided declarations that TÜV "regularly conducts its certification of HP products within the State of Oregon."

In combination, that evidence supports an inference that TÜV availed itself of the privilege of securing clients in Oregon for its testing and certification services. But that point is not in dispute. The challenge for HP is in identifying a relationship between those Oregon activities and the present litigation—litigation involving services that TÜV performed for a Connecticut manufacturer on a type of product that TÜV has never certified in Oregon—that is "close enough" to permit the exercise of specific personal jurisdiction.

HP argues that TÜV's Oregon activities establish the required relationship among TÜV, Oregon, and this

---

[13] Neither the record nor HP's arguments provide context for TÜV's offering of a seminar about robots or the reasonable inferences that should be drawn from that evidence. In the absence of some guidance from HP, we struggle to assign significance to the seminar offering apart from inferential support for the proposition that TÜV was attempting to make a connection with potential Oregon clients for its testing and certification services.

litigation because—according to HP—TÜV "actively developed, cultivated, and marketed a reputation as a provider of technical expertise and services in the State of Oregon" and, by doing so, TÜV made it foreseeable that any product bearing a TÜV certification mark would be desirable to businesses in Oregon that were aware of TÜV's reputation. For its part, TÜV insists that it has engaged in no Oregon activities that are related to HP's claim that TÜV negligently certified the Proton hydrogen generator in Connecticut and, thus, that Oregon lacks specific personal jurisdiction over TÜV in this case.

Although TÜV's argument may unduly emphasize the location of its allegedly negligent work—given our disavowal in *Robinson* of the "substantive relevance" test—we agree that the identified relationship between TÜV's Oregon activities and the present litigation is not close enough to permit an Oregon court to exercise specific personal jurisdiction. There are two main obstacles to HP's theory of foreseeability. First, the evidence regarding TÜV's Oregon activities is minimal and does little to support HP's "relatedness" arguments. As *Robinson* emphasizes, it is the plaintiff's burden "to allege and prove facts sufficient to establish jurisdiction over a particular defendant." 354 Or at 576. Yet HP submitted no evidence that TÜV marketed its services to potential clients in Oregon apart from the two postings on its website—one from 2006 and one undated—and no evidence that TÜV performed its services for any Oregon client apart from HP. Even the evidence that TÜV performed work for HP adds little support to HP's arguments. Although we accept as true the declarations of HP personnel that TÜV had performed some product certification work for HP in Oregon, the record contains no information regarding the type of product certified and no basis for inferring that the work demonstrated anything about TÜV's reliability as a certifier of potentially explosive products such as hydrogen generators.

We also accept as true the representation of HP employees that TÜV's Oregon approvals and prior work for HP in Oregon caused HP to "believe[] that it could rely on TÜV's certifications of the hydrogen generator at issue in this case." But that assertion gives rise to the second

obstacle to HP's theory of foreseeability. The assertion hints at a causal link between TÜV's Oregon activities and HP's decision to purchase the hydrogen generator from Proton, but a causal link, alone, is not enough to permit Oregon to exercise specific personal jurisdiction over a nonresident defendant. *See id.* at 588-90 (rejecting the simple "but-for" test for specific personal jurisdiction because it paid "too little regard to whether litigation in a forum state is reasonably foreseeable by a nonresident defendant"). Even where a causal link exists, due process demands a close enough relationship between the litigation and the defendant's Oregon activities to make it reasonably foreseeable that the nonresident defendant would be haled into court in Oregon to answer the specific allegations. *See id.* at 578 (emphasizing that due process is "satisfied if the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there" (internal quotation marks omitted)).

*Ford Motor Co.* supplies significant guidance regarding what kinds of relationships are "close enough" to permit the exercise of specific personal jurisdiction, and that guidance persuades us that the record here fails to establish a relationship among TÜV, Oregon, and the present litigation that is close enough to permit Oregon to exercise specific personal jurisdiction in this case. First, the Court in *Ford Motor Co.* detailed how Ford's activities in the forum states connected it to individual forum state residents who were prospective and existing Ford vehicle owners and drivers—people just like the plaintiffs, even if not the particular plaintiffs in the instant cases. 592 US at ___, 141 S Ct at 1028-29. Unlike Ford's activities in the forum states, however, TÜV's Oregon activities were not directed at, and did not connect it to, prospective Oregon purchasers of products like the Proton hydrogen generator—which is HP's role as a plaintiff in this case. Instead, TÜV's Oregon activities at best connected it to Oregon manufacturers who were prospective or existing clients for TÜV's certification and testing services. There is no evidence that TÜV marketed or sold generators, or any similar product, to prospective Oregon purchasers. Indeed, there is no evidence that any Oregon company had previously purchased a Proton generator or any other product that TÜV

had certified. Thus, unlike in *Ford Motor Co.*, nothing about TÜV's Oregon activities connected it to other Oregon businesses like HP, who were prospective purchasers of products that TÜV had certified elsewhere.

Second, the Court emphasized that Ford had "systematically served a market in [the forum states] for the very" product at issue in the plaintiffs' cases (1996 Explorers and 1994 Crown Victorias). *Id.* at ___, ___, ___, ___, 141 S Ct at 1022, 1023, 1028, 1030. Here, however, there is no evidence that TÜV had "systematically" served any market in Oregon, let alone a market in Oregon for the "very" product at issue in this case. There is no evidence that TÜV had sold or promoted a Proton hydrogen generator in Oregon. There is no evidence that TÜV encouraged Proton to sell one of its hydrogen generators in Oregon. And there is no evidence that TÜV had a reason to be aware that any of its clients in Oregon were in the market for a hydrogen generator, until it learned of the explosion at HP. Indeed, there is no evidence that TÜV had ever promoted in Oregon any product bearing its certification mark and no evidence that TÜV had marketed to out-of-state product manufacturers the fact that it had contacts with Oregon.

Even if—as HP seems to assume—the relevant "product" actually is the testing and certification services that TÜV provided to Proton for the H Series Hydrogen Generator, the record still fails to connect that "product" to the testing and certification services that TÜV previously provided to an Oregon market. There is no evidence that TÜV ever previously certified a hydrogen generator, or any type of generator, for an Oregon client. And there is no evidence that TÜV ever attempted to serve a market in Oregon for certification of generators. Indeed, a representative of TÜV expressly asserted that TÜV had not performed any testing of certification work in Oregon "relating to generators of any kind," and HP has not contested that assertion. Thus, unlike in *Ford Motor Co.*, there is no link that connects the product at issue in this case to sales or marketing of similar products in Oregon.

Finally, the Court in *Ford Motor Co.* emphasized that allowing the exercise of personal jurisdiction in the cases before it "treats Ford fairly." *Id*. at ___, 141 S Ct at

1029. The Court recited the many activities that "make Ford money" in the forum states, including selling new and used Ford vehicles to forum residents and maintaining, repairing, and supplying replacement parts for Ford vehicles in the forum states. *Id.* at ___, 141 S Ct at 1028. The Court then explained that Ford's enjoyment of "the benefits and protection of" the forum states' laws with respect to the business that Ford conducts in those states created "reciprocal obligations" with respect to safety of "the car models Ford so extensively markets" to forum residents. *Id.* at ___, 141 S Ct at 1029-30 (internal quotation marks and citations omitted). The Court also concluded that an automaker like Ford has "clear notice" that it will be subject to litigation in the forum when a vehicle that it has been "regularly marketing" in the forum malfunctions and causes injury in the forum. *Id.* at ___, 141 S Ct at 1030 (internal quotation marks omitted).

In those respects, as well, this case is unlike *Ford Motor Co.* The activities that "make [TÜV] money" in Oregon are the testing and certification of products manufactured by Oregon companies. *See id.* at ___, 141 S Ct at 1028. With respect to those activities, TÜV enjoys the benefit and protection of Oregon law and may incur "reciprocal obligations" with respect to how well it performs those services for Oregon manufacturers. If TÜV were to be haled into court in Oregon to defend a claim involving its performance of those services for an Oregon client, there is little reason to doubt that the Oregon's exercise of specific personal jurisdiction would be consistent with the requirements of due process. But no Oregon company is alleged to have participated in the manufacture of the Proton hydrogen generator, and no out-of-state manufacturer is alleged to have chosen TÜV to perform certification services because of TÜV's Oregon connections. There also is no evidence that TÜV benefited in any way from Proton's ability to sell one of its hydrogen generators in Oregon.

Instead, the litigation in this case is related to Oregon through the path of HP's purchase of a product that TÜV did not certify for an Oregon company and did not market to an Oregon company. That path does not draw on the "benefits and protection" that Oregon law provides to TÜV with respect to its testing and certification services in

Oregon. *See id*. at ___, 141 S Ct at 1029 (internal quotation marks omitted). For example, TÜV does not enjoy the benefits and protections of Oregon law in its status as an NRTL, a nationwide program administered by federal OSHA. It does not enjoy the benefits and protections of Oregon law when it certifies products to industry safety standards. And it does not enjoy the benefits and protections of Oregon law when it certifies products for manufacturers in other states. To put it in Supreme Court terminology, we cannot conclude that the activities for which TÜV received the benefits and protection of Oregon law are related to Proton's sale of one of its hydrogen generators to HP in a way that would have provided TÜV "clear notice" that it would be subject to suit in Oregon when the hydrogen generator malfunctioned. *See id*. at ___, 141 S Ct at 1030 (internal quotation marks omitted). And to put it in our *Robinson* terminology, TÜV's Oregon activities do not establish the "tacit quid pro quo that makes litigation in the forum reasonably foreseeable." *See Robinson*, 354 Or at 592 (internal quotation marks omitted).

HP, nevertheless, proposes two ways that TÜV's Oregon activities can be linked to the present litigation in Oregon. First, HP proposes the kind of link to Oregon that might be significant if supported by the record. In HP's briefing to this court, it asserts for the first time that "TÜV certified the plans and specifications of the Generator at issue as being compliant with all applicable standards—including the standards of the State of Oregon of which it was an expert." A connection of that type might well make it foreseeable to an Oregon-approved firm that products bearing the firm's certification would be purchased for use in Oregon, regardless of where the product was manufactured. But HP has offered no support for the contention that TÜV's Oregon approvals mean that it certified the Proton generator—or any product—to "the standards of the State of Oregon."[14] The certification for the Proton hydrogen generator at issue

---

[14] In a mandamus proceeding based on a motion to dismiss for lack of personal jurisdiction, we will assume that trial court resolved disputed issues of fact necessary to its conclusion in favor of the prevailing party. *Barrett*, 361 Or at 117 n 1 (construing "any disputed facts consistently with the trial court's ruling"). However, because HP did not argue in the trial court that TÜV certified the generator to Oregon standards, to the extent that is a factual question, we do not afford it the benefit of the assumption described in *Barrett*.

in this case shows that TÜV certified the generator's design as meeting the applicable ISO standard—Standard 22734-1:2008, Hydrogen Generators Using Water Electrolysis Process—and there is no basis in the record for inferring that the standards set by ISO are also "standards of the State of Oregon." Indeed, the only evidence in the record that addresses the meaning of certification by an NRTL—a federal OSHA "frequently asked questions" web page—indicates that federal OSHA-approved NRTLs certify products to standards set by nongovernmental associations, not standards set by federal OSHA or by any state.[15] Thus, we reject HP's argument that specific jurisdiction can be based on any link between Oregon standards and the certification that TÜV provided for Proton's H Series Hydrogen Generator.[16]

HP also proposes an external link to bridge the gap between the certification and testing services that TÜV marketed to Oregon manufacturers and the present litigation over services that TÜV provided to an out-of-state manufacturer that sold one piece of equipment to an Oregon business. The link, according to HP, comes from TÜV's effort to market on a national and international level a message that manufacturers could strengthen the consumer market for their products by hiring TÜV to perform testing and certification services. HP also points to evidence that TÜV "authorized Proton to market the [Proton H Series hydrogen generators] with its trademark and seal" and asserts that TÜV did so "knowing that businesses engaged in highly technical

---

[15] According to the OSHA document, there are 39 product types for which OSHA's workplace safety rules require employers to use only a product that has been certified by an OSHA-approved NRTL as compliant with applicable standards.

[16] As noted above, it does not appear that Oregon has its own program for certifying NRTLs; instead, Oregon adopts by reference the national NRTL program. 368 Or at 499 n 12; *see* OAR 437-002-0005(7) (incorporating by reference the federal OSHA NRTL program); OAR 437-002-0007 ("By adopting these rules, the Department [of Consumer and Business Services] does not establish a testing and certification program separate from the federal OSHA Testing and Certification Program."). Accordingly, TÜV's status as an NRTL does not indicate that it certifies products to Oregon standards. Similarly, Oregon's field evaluation program appears to use standards that are not specific to the State of Oregon. *See* OAR 918-306-0005 (adopting National Fire Protection Association and UL standards for use in product evaluation).

industries, such as HP in Oregon, relied upon TÜV's expertise." HP adds that the nature of a certification is that it is relied upon by those who buy a certified product. HP insists that those activities made it reasonably foreseeable that TÜV would be sued in Oregon by an Oregon business that was influenced to purchase a defective product in part by its trust in TÜV's reputation as a product certifier.

As an initial matter, we are skeptical that the Due Process Clause permits Oregon to look elsewhere to create a path to specific personal jurisdiction when a defendant's Oregon activities do not create that path. We held in *Robinson* that "the litigation must arise out of or relate to at least one of" the activities that a defendant has "purposefully directed" at this state. 354 Or at 594 (internal quotation marks omitted). *Ford Motor Co.* confirms that requirement, emphasizing that the litigation "must arise out of or relate to the defendant's contacts with the forum." 592 US at ___, 141 S Ct at 1025 (internal quotation marks omitted).

In any event, the record with respect to TÜV's national and international marketing is too thin to support the link that HP proposes. The evidence that TÜV marketed its certification services as well regarded and a TÜV certification as an asset to the manufacturer's sales consists of two exhibits that HP describes as "promotional materials and information taken from TÜV's website." The first states that TÜV's "Market Access Services experts have comprehensive technical know-how in all areas of technology and business helping to ensure secure, international access to target markets" and that businesses should "[t]ake advantage of our international reputation and our almost 150 years of experience as a global, independent testing, inspection and certification organization." The other highlights TÜV's performance of certification services around the world; refers to a free "internet platform" that would allow "consumers as well as manufacturers, buyers and retailers" to find information about TÜV-certified products; and makes a pitch that, "[w]ith TÜV Rheinland as your partner for product audits and certifications, you can [s]trengthen your company's success on the market with a neutrally-audited, quality product * * * [and b]ack your advertising campaign with

strong statements."[17] Yet the record provides no evidence that either document was directed to an Oregon audience or was ever seen by anyone in Oregon.[18] Neither document suggests that the message was targeted at potential purchasers of products. And neither document suggests that TÜV had experience providing testing and certification services for products subject to the kind of safety standards that govern hydrogen generators. Finally, there is no evidence that any consumer other than HP was influenced in its product-purchasing decisions to choose a product that had been certified by TÜV.

We concluded in *Robinson*, the plaintiff could not construct the necessary connection to litigation in Oregon through evidence that the Idaho defendant had an interactive website that was "accessible to Oregon customers," even though the website had promoted the sale of motorcycles of the type that injured the plaintiff, repair services of the type that the defendant had provided to the plaintiff, and promotional events of the type that the plaintiff had previously attended. 354 Or at 575, 595. We recognized the possibility that, "[w]hile situated in Oregon, plaintiff may have become familiar with defendant's [business] in part as a result of defendant's website," but we concluded that the "nexus between [the] defendant's Internet advertising in Oregon and its allegedly negligent repairs in Idaho [was] remote" and that the relationship between the internet presence and the litigation in Oregon was "tenuous." *Id.* at 595-96. Here, the potential link between TÜV's nontargeted internet postings and the possibility that a consumer in Oregon would choose to purchase a product that TÜV had certified

---

[17] TÜV challenges HP's reliance on the global marketing documents, raising questions about whether the marketing was produced and distributed by TÜV's international parent company and whether that should preclude attributing the same message to TÜV. Our conclusion that the internet documents do not supply a basis for jurisdiction, in any event, makes it unnecessary to resolve TÜV's challenge.

[18] We do not suggest that advertising must be targeted uniquely at Oregon to be considered Oregon activity. It was no obstacle for the plaintiffs in *Ford Motor Co.* that Ford directed the same marketing, sales, and services at the forum states as it directed everywhere. *See* 592 US at ___, 141 S Ct at 1022 (explaining that "Ford markets, sells, and services its products across the United States and overseas" and that, "[n]o matter where you live, you've seen [the messages]: 'Have you driven a Ford lately?' or 'Built Ford Tough'").

elsewhere is, similarly, too tenuous to create the relationship that due process demands among the defendant, the forum, and the specific litigation.

## V.  CONCLUSION

As framed by the record here, we have understood the jurisdictional dispute to turn on the answer to one question: Whether the relationship among TÜV, Oregon, and the present litigation is close enough to satisfy the demands of due process given that TÜV's Oregon activities consisted of limited efforts to reach Oregon manufacturers that might need testing and certification services for their products and the present litigation stems not from any services that TÜV provided to an Oregon manufacturer but, instead, from services that TÜV performed elsewhere for a product unlike any that TÜV had previously certified in Oregon and for a manufacturer with no prior product sales in Oregon. That is a "fact-intensive" inquiry that could produce a different answer with a change in any one fact that we have considered. *See Robinson*, 354 Or at 581. On the record before us, however, we conclude that there is not a sufficient "relationship among the defendant, the forum, and the litigation" to create "the essential foundation" of specific personal jurisdiction. *See Ford Motor Co.*, 592 US at ___, 141 S Ct at 1028 (internal quotation marks omitted). Accordingly, we issue a peremptory writ ordering the trial court to vacate its denial of TÜV's motion to dismiss for lack of personal jurisdiction, to grant that motion, and to dismiss HP's claim against TÜV.

A peremptory writ of mandamus shall issue.