IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
November 9, 2022 Session Heard at Jackson

## ROGER BASKIN v. PIERCE & ALLRED CONSTRUCTION, INC.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 20-872-IV          Russell T. Perkins, Chancellor**
———————————————————————

**No. M2021-00144-SC-R11-CV**
———————————————————————

In this appeal, we address whether a Tennessee resident may sue an Alabama corporation in a Tennessee court for alleged breach of contract and breach of warranty pertaining to its construction of a custom lake house in Alabama. Tennessee resident Roger Baskin hired Pierce & Allred Construction, an Alabama corporation with its principal place of business in Alabama, to build a house on a parcel of land in Alabama. Mr. Baskin supplied the architectural plans and some of the materials, all sourced from Tennessee, and the parties communicated throughout the project from their respective states. However, all of Pierce & Allred Construction's activities on the project occurred in Alabama. Mr. Baskin ultimately became dissatisfied with the quality and expense of the construction work, and he filed suit in the Davidson County Chancery Court. Pierce & Allred Construction moved to dismiss the complaint for lack of personal jurisdiction, arguing that the corporation lacked the "minimum contacts" with Tennessee that due process protections require. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The trial court granted the motion, finding that the events relevant to the claims occurred in Alabama and that the corporation's contacts with Tennessee were minor and attenuated. The Court of Appeals reversed, looking to recent decisions from this Court, see Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC, 610 S.W.3d 460 (Tenn. 2020), and the United States Supreme Court, see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017 (2021) (explaining that the exercise of specific personal jurisdiction requires that a plaintiff's claim arise out of or relate to the defendant's forum contacts). We granted permission to appeal. Based on our review, we have determined that Pierce & Allred Construction's contacts with Tennessee were not such that the corporation reasonably should have anticipated being haled into a Tennessee court to answer this suit. In making this determination, we conclude that certain contacts with Tennessee did not reflect that the corporation purposefully availed itself of the privilege of conducting business activities in Tennessee, while certain other contacts were not sufficiently related to Mr. Baskin's claims to support the exercise of specific personal jurisdiction. Thus, we hold that Mr. Baskin failed to establish a prima facie case of the minimum contacts necessary for a Tennessee

court to exercise specific personal jurisdiction over the Alabama corporation. Accordingly, we reverse the decision of the Court of Appeals and reinstate the judgment of the trial court dismissing Mr. Baskin's complaint.

**Tenn. R. App. P. 11 Appeal by Permission;
Judgment of the Court of Appeals Reversed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROGER A. PAGE, C.J., and SHARON G. LEE, HOLLY KIRBY, and SARAH K. CAMPBELL, JJ., joined.

Charles S. Michels, Nashville, Tennessee, for the appellant, Pierce & Allred Construction, Inc.

Paul J. Krog and Nicholas W. Tsiouvaras, Brentwood, Tennessee, for the appellee, Roger Baskin.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This case arose from a dispute between Tennessee resident Roger Baskin ("the Plaintiff") and Pierce & Allred Construction, Inc. ("the Defendant"), an Alabama corporation whose principal place of business is in Florence, Alabama. The Defendant is a licensed general contractor in Alabama, performing both residential and commercial work. Justin Allred is the sole owner and president of the Defendant. The Defendant has seven employees who work principally out of Florence.

In September 2016, based on a personal recommendation, the Plaintiff reached out to Mr. Allred seeking the Defendant's services for the demolition of an existing structure and construction of a custom lake house on a parcel of land in Muscle Shoals, Alabama. Working from Alabama, the Defendant crafted a construction proposal and sent it to the Plaintiff for approval. The Plaintiff accepted and signed the proposal—in the Defendant's office in Alabama—on or about September 16, 2016. The parties do not suggest that the signed proposal ("the contract") had a forum selection clause.[1] The contract indicated that the project ("the Baskin project") was to be completed in approximately fifteen months (around January 2018). The parties agreed that the Defendant would be paid on a "cost plus basis," meaning that the Plaintiff would pay the reasonable cost of all labor and materials plus a contractor's fee of twelve percent. At the time of the contract, the labor

---

[1] The contract is not in the record. Although the parties do not appear to dispute relevant facts pertaining to the contract, the better practice in this contract dispute would be for the parties to attach the contract to at least one of the filings that addressed whether the trial court properly could exercise personal jurisdiction over the Defendant.

and materials were estimated to amount to $924,000.00, meaning that the total estimated cost was $1,034,880.00.

Upon entering into the contract, the Plaintiff provided the Defendant with architectural plans designed by a Tennessee firm. However, the Defendant had no contact with the firm or role in developing the plans. Likewise, based on his existing relationships with suppliers located in Tennessee, the Plaintiff purchased lumber, tile, windows, and flooring materials in Tennessee, and he had those materials shipped to Alabama. Just as with the architectural plans, the Defendant was not involved in selecting the suppliers or materials, nor did the Defendant play a role in transporting the materials to Alabama. In accordance with the contract, however, the Plaintiff did pay the Defendant the twelve-percent contractor's fee on those materials.

All of the Defendant's work pursuant to the contract occurred in Alabama. In addition, all subcontractors on the project were based in Alabama, and thus, all of the expenses the Defendant incurred were from labor and materials in Alabama. In fact, no person affiliated with the Defendant ever set foot in Tennessee in relation to the Baskin project, from the proposal that led to the establishment of the contractual relationship through the eventual breakdown of the relationship. There were six to eight in-person meetings between the parties during the course of the project, but they all took place in Alabama. The parties did communicate frequently during the project by electronic mail, text message, and telephone—the Defendant from Alabama and the Plaintiff from Tennessee. The parties do not detail the substance of these communications, but it is clear that the Defendant sent invoices to the Plaintiff electronically, and the Plaintiff paid the invoices through wire transfers originating from his bank account in Tennessee.

According to the Plaintiff, the Defendant "grossly mismanaged" the Baskin project. As a result, the Plaintiff paid the Defendant more than $1,700,000.00, well in excess of the initial cost estimate. Furthermore, according to the Plaintiff, the Defendant "left [the Plaintiff] with a home riddled with construction defects that affect every major system of the home." The Plaintiff ultimately decided to hire a replacement contractor to remedy the alleged deficiencies and complete the project. It is unclear from the record exactly when the contractual relationship between the parties broke down and when the replacement contractor began working. However, on September 3, 2020, the Plaintiff filed suit against the Defendant in the Chancery Court for Davidson County, Tennessee. The Plaintiff asserted claims for breach of contract and breach of warranty. In particular, the Plaintiff alleged that the Defendant: (1) failed to construct the house in accordance with the plans and in a good and workmanlike manner; (2) failed to complete construction on time and within budget; (3) charged the Plaintiff for services that were never rendered and materials that were never provided; and (4) "negligently allowed expensive audio equipment delivered to the project site to be misappropriated."

In December 2020, the Defendant filed a motion to dismiss the suit for lack of personal jurisdiction, see Tenn. R. Civ. P. 12.02(2), arguing that it did not have the requisite "minimum contacts" to be subject to jurisdiction in Tennessee.[2] Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The Defendant attached to its motion a supporting affidavit from its owner and president, Justin Allred.[3] The Plaintiff filed a response opposing the motion and attached his own supporting affidavit as well as portions of a deposition of Mr. Allred[4] and documents pertaining to the Defendant's business activities in Tennessee. Based on these materials, the Plaintiff argued that the Defendant's purposeful, deliberate actions directed toward Tennessee were substantial enough that it reasonably should have anticipated being haled into court in Tennessee. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76 (1985) (looking to whether the defendant's deliberate conduct was such that he reasonably should have anticipated being haled into court in the forum state); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (same).

The parties' filings made one point very clear: Since the formation of the corporation in Alabama in 2013, the Defendant has engaged in two construction-related projects in Tennessee. In the first instance, the Defendant was involved in moving a nine-hundred-square-foot cabin from outside Nashville, Tennessee to Florence, Alabama. This endeavor ("the cabin project") entailed loading the cabin onto a tractor-trailer and driving it from Tennessee to Alabama. However, the Defendant did not actually perform the loading and transportation work, instead acting more as a facilitator.[5] The Defendant subcontracted with a mobile-home-moving company based in Alabama to perform the work. That Alabama company obtained the necessary licenses and permits for the project. Justin Allred did come to Tennessee on one occasion to see the cabin site, and the Defendant's vice president of construction visited the site twice.[6] The amount of the

---

[2] The Defendant also sought dismissal based on improper venue, see Tenn. R. Civ. P. 12.02(3), but that issue is not before this Court.

[3] In January 2021, the Defendant submitted another affidavit from Mr. Allred in conjunction with a reply to the Plaintiff's filings.

[4] It appears that the trial court allowed limited discovery pertaining to the question of personal jurisdiction over the Defendant, as Mr. Allred sat for a deposition in January 2021.

[5] The Defendant performed typical construction work once the cabin had been transported to Alabama.

[6] The record does not reveal whether one of those occasions was at the same time Justin Allred visited the site. In addition, the record does not reveal when any of the visits occurred or their lengths.

contract for the cabin project was less than $30,000.00. It is unclear from the record exactly when the cabin project occurred or how long it lasted.[7]

The Defendant's other project in Tennessee arose in early 2018, around the time of the estimated completion date of the Baskin project.[8] The Defendant was hired to construct a custom nine-thousand-square-foot house on Pickwick Lake in Hardin County, Tennessee ("the Bradley project"). The Bradley project was valued at just under $3,000,000.00. In February 2018, because the Bradley project site was located in Tennessee, the Defendant applied for a Tennessee residential contractor's license.[9] That same month, Justin Allred traveled in person to Tennessee to take a Tennessee Business and Law Management exam required for obtaining the contractor's license.[10] The Defendant received a Tennessee residential contractor's license in March 2018. Absent renewal, the license was set to expire on March 30, 2020. The Defendant arranged for its website to reflect that it was licensed in Alabama and Tennessee.

In addition, as part of the contractor's license application process, the Defendant registered with the Tennessee Secretary of State in February 2018 as a foreign corporation doing business in Tennessee. No person affiliated with the Defendant came to Tennessee as part of this process. Rather, the Defendant simply submitted required documentation and a fee to the Tennessee Secretary of State. Justin Allred was designated as the Defendant's registered agent, listing the Nashville address of a friend and business associate.

The Defendant began work on the Bradley project in spring 2018, shortly after receiving its Tennessee contractor's license. All subcontractors for the Bradley project were brought to Tennessee from Alabama. Materials suppliers also were from Alabama, with the exception of a concrete supplier based in Tennessee.[11] Likewise, the Defendant

---

[7] In his brief to this Court, the Defendant indicates that the cabin project occurred before the parties entered into the contract for the Baskin project.

[8] Under the contract, the estimated completion date of the Baskin project was around January 2018. However, the record contains documentation suggesting that, as of February 2018, the Defendant was anticipating completion of the project by May 15, 2018.

[9] Because the Defendant sought the license with respect to the Bradley project in particular, the Defendant applied for only a residential contractor's license. The Defendant performs commercial work in Alabama, and Justin Allred testified that he would be open to commercial work in Tennessee should the opportunity arise.

[10] In addition, Mr. Allred passed a Home Builders Licensure Board exam in Alabama in 2015 for the Defendant's Alabama contractor's license. The record suggests that his passing score—used for the Alabama contractor's license—satisfied a requirement for the contractor's license in Tennessee.

[11] The Defendant paid this supplier by checks mailed to Tennessee.

did not use or rent equipment out of Tennessee for the project. Justin Allred personally visited the Bradley site approximately twelve to fifteen times over the course of the project. Mr. Allred testified in his January 2021 deposition that he last visited Tennessee around the early fall of 2020 to go to the Bradley project site. The Defendant's vice president of construction also visited the site during the course of the project. The Bradley project was completed in approximately a year and a half, that is, in late 2020.

In his January 2021 deposition, Mr. Allred testified that he hoped the Defendant would have future projects located in Tennessee, but there was nothing else in development after the Bradley project.[12] Although Mr. Allred testified that he intended to maintain the Defendant's Tennessee contractor's license, he added that if it expired, he was not sure that he would renew it. In fact, apparently unbeknownst to Mr. Allred at the time of his deposition, the Defendant's Tennessee contractor's license had expired on March 30, 2020. In January 2021, after his deposition, Mr. Allred submitted an affidavit clarifying that he was not then seeking to have the Defendant's Tennessee contractor's license renewed. Similarly, the Tennessee Secretary of State administratively revoked the Defendant's business registration on August 6, 2019. In his January 2021 affidavit, Mr. Allred stated that he was not then seeking to renew the Defendant's status as a foreign corporation registered for business in Tennessee.

Based on these facts, the trial court granted the Defendant's motion to dismiss. The trial court found that "the alleged causes of action here and all relevant events clearly occurred in Alabama." In addition, the trial court noted that the Defendant's other activities that occurred in Tennessee "are unrelated to [the Plaintiff's] cause of action." Ultimately, the trial court determined that "[t]he minor and attenuated contacts [the Defendant] had with Tennessee during the [Baskin project] and otherwise are insufficient to cause [the Defendant] to reasonably anticipate being haled into court in Tennessee." Accordingly, the trial court concluded that the Plaintiff failed to establish the Defendant's requisite minimum contacts with Tennessee, and thus, the court lacked personal jurisdiction over the Defendant with respect to the Plaintiff's suit.

On the Plaintiff's direct appeal, the Court of Appeals reversed. Baskin v. Pierce & Allred Constr., Inc., No. M2021-00144-COA-R3-CV, 2022 WL 258631, at *1 (Tenn. Ct. App. Jan. 28, 2022), perm. app. granted, (Tenn. July 15, 2022). In finding the existence of minimum contacts, the intermediate appellate court relied heavily on this Court's recent decision in Crouch Railway Consulting, LLC v. LS Energy Fabrication, LLC, 610 S.W.3d 460 (Tenn. 2020), a case in which we determined that a Tennessee court properly could exercise specific personal jurisdiction over an out-of-state corporate defendant in a contractual dispute. The Court of Appeals concluded that "[t]he contacts and connections of [the] Defendant to Tennessee in this case are significantly more substantial than those

---

[12] At the time of Mr. Allred's deposition, the Defendant had roughly six projects in progress, all of which were located in Alabama.

of the defendant in <u>Crouch</u>." <u>Baskin</u>, 2022 WL 258631, at *6. As for those "contacts and connections," the court noted that the construction plans for the Baskin project were created in Tennessee by a Tennessee firm, that some of the materials used in the construction came from Tennessee, and that the Defendant directed communications and invoices to the Plaintiff in Tennessee. <u>Id.</u> Furthermore, looking to the Defendant's two projects that occurred in Tennessee, the court took note of the Defendant's "direct, purposeful attempts to solicit and conduct its business in Tennessee" and found it significant that the Defendant obtained a Tennessee contractor's license, registered with the Tennessee Secretary of State to do business in Tennessee, and stated on its website that it was licensed in Alabama and Tennessee. <u>Id.</u> Because these "contracting and residential construction activities in Tennessee [were] of the same nature as those that occurred [on the Baskin project]," <u>id.</u> at *8, the court found the activities sufficiently "related to" the Plaintiff's suit to bear on the jurisdictional question. <u>See</u> <u>Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.</u>, 141 S. Ct. 1017, 1026 (2021) (explaining that the exercise of specific personal jurisdiction requires that a plaintiff's claim arise out of or relate to the defendant's forum contacts). Considering all of the circumstances detailed above, the court held "that [the] Defendant's contacts with Tennessee, including its purposeful applications for a certificate of authority to transact business and for a contractor's license in Tennessee, are such that [the] Defendant should reasonably anticipate being haled into court in this state."[13] <u>Baskin</u>, 2022 WL 258631, at *1.

The Defendant sought permission to appeal to this Court. At the most fundamental level, the Defendant argued that its contacts with Tennessee were not substantial enough to support specific personal jurisdiction as to the Plaintiff's suit. Given the treatment of the issue in the intermediate appellate court, however, the Defendant also took issue with the decision of the Court of Appeals even to factor into the jurisdictional determination the Defendant's activities pertaining to the two projects in Tennessee. The Defendant argued that neither the cabin project nor the Bradley project had any connection whatsoever to the Baskin project—the source of the Plaintiff's claims—and, thus, the Defendant's Tennessee contacts pertaining to those two projects did not "relate to" the Plaintiff's suit. In addition, the Defendant argued that any contacts with Tennessee that occurred *after* the accrual of the Plaintiff's claims—according to the Defendant, those contacts or activities pertaining to the Bradley project—could not possibly "relate to" the Plaintiff's claims and, therefore, were not germane to the question of whether the Defendant was subject to specific personal jurisdiction in Tennessee as to the Plaintiff's suit. We granted the Defendant's application for permission to appeal.

---

[13] The Court of Appeals proceeded to the final step in the jurisdictional analysis, namely whether the Defendant had shown that the exercise of jurisdiction by a Tennessee court would nonetheless be unfair or unreasonable. <u>See, e.g.</u>, <u>Crouch</u>, 610 S.W.3d at 473. Looking to the applicable standards, the court concluded that it was constitutionally permissible for the trial court to exercise jurisdiction over the Defendant. <u>Baskin</u>, 2022 WL 258631, at *9.

## II. ANALYSIS

We have recognized that evaluating the validity of the exercise of specific personal jurisdiction is in some cases a "difficult task." Crouch, 610 S.W.3d at 474. Although the jurisprudence on the issue is plentiful, it has come to be accepted that "few answers will be written 'in black and white.'" Kulko v. Super. Ct., 436 U.S. 84, 92 (1978) (quoting Estin v. Estin, 334 U.S. 541, 545 (1948)). Nevertheless, the touchstone remains that due process requires that a nonresident defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). Following the lead of the United States Supreme Court, we have synthesized the general approach courts must take as follows:

> Determining whether a forum state may exercise specific personal jurisdiction over a nonresident defendant is a two-step analysis which requires a court to analyze first whether the defendant's activities in the state that gave rise to the cause of action constitute sufficient minimum contacts with the forum state to support specific jurisdiction and, if so, whether the exercise of jurisdiction over the nonresident defendant is fair.

First Cmty. Bank, N.A. v. First Tenn. Bank, N.A., 489 S.W.3d 369, 388 (Tenn. 2015). Among other requirements, federal constitutional precedent makes clear that for a court to exercise specific personal jurisdiction, a plaintiff's claim must arise out of or be related to the defendant's forum contacts. See, e.g., Ford, 141 S. Ct. at 1026. Likewise, this Court also has recognized that "the assertion of specific jurisdiction is appropriate only when the plaintiff's cause of action arises from or is related to the defendant's contacts with the forum state." Gordon v. Greenview Hosp., Inc., 300 S.W.3d 635, 648 (Tenn. 2009).

In this appeal, the facts prompt a two-prong focus—one on the Defendant's activities associated with the Baskin project, and the other on the Defendant's activities associated with the cabin project and the Bradley project—to assess whether the record reflects a prima facie showing of minimum contacts with Tennessee so as to support the exercise of specific personal jurisdiction over the Defendant. As to the first prong, we conclude that the Defendant's activities associated with the Baskin project do not reflect that the Defendant purposefully availed itself of the privilege of conducting activities in Tennessee—or stated another way, purposefully directed its activities at Tennessee—even in light of our recent decision in Crouch. As to the second prong, we conclude that the Defendant's activities associated with the cabin project and the Bradley project were not sufficiently related to the Plaintiff's claims to support the exercise of specific personal jurisdiction, even in light of the decision of the United States Supreme Court in Ford.

## A. Standard of Review

"A trial court's decision regarding the exercise of personal jurisdiction over a defendant presents a question of law, which we review de novo with no presumption of correctness." First Cmty. Bank, 489 S.W.3d at 382 (citing State v. NV Sumatra Tobacco Trading Co., 403 S.W.3d 726, 768 (Tenn. 2013); Gordon, 300 S.W.3d at 645).

In this case, the Defendant challenged the exercise of personal jurisdiction through a motion to dismiss the complaint under Rule 12.02 of the Tennessee Rules of Civil Procedure. The Defendant supported this motion with affidavits, and the Plaintiff's response included an affidavit and portions of a deposition. We have recognized that a defendant may make such a challenge via a motion to dismiss the complaint under Rule 12.02. See, e.g., Crouch, 610 S.W.3d at 470. The defendant may support its motion with affidavits or other materials but is not required to do so. Id.; Gordon, 300 S.W.3d at 644. When the defendant chooses to submit such materials, the plaintiff may not rely solely on the allegations in the complaint and, instead, also must submit affidavits or other materials to carry its burden. Crouch, 610 S.W.3d at 470; Gordon, 300 S.W.3d at 644. However, the submission of matters outside the pleadings does not convert the Rule 12.02(2) motion to dismiss into a motion for summary judgment. Sumatra, 403 S.W.3d at 739; Gordon, 300 S.W.3d at 644. When a defendant challenges the state's exercise of personal jurisdiction in this manner, the plaintiff bears the burden of establishing a prima facie case for personal jurisdiction over the defendant. Crouch, 610 S.W.3d at 470.

When evaluating whether the plaintiff has established a prima facie case for personal jurisdiction, the trial court must accept the plaintiff's factual allegations as true and resolve all factual disputes in the plaintiff's favor. Id.; Sumatra, 403 S.W.3d at 739. However, the court may disregard "allegations that are controverted by more reliable evidence and plainly lack credibility, conclusory allegations, or farfetched inferences." Crouch, 610 S.W.3d at 470 (citing First Cmty. Bank, 489 S.W.3d at 382). Ultimately, the court must determine whether the factual allegations in the plaintiff's complaint and any supporting materials establish, with reasonable particularity, sufficient contacts between the defendant and Tennessee. First Cmty. Bank, 489 S.W.3d at 383. In conducting our de novo review, we perform the same evaluation of the complaint and supporting materials as the trial court. Crouch, 610 S.W.3d at 471.

## B. Personal Jurisdiction Principles

We begin by recognizing the well-established principle that a court must have jurisdiction over a defendant before it can enter a valid judgment. See, e.g., Kulko, 436 U.S. at 91. The Fourteenth Amendment's Due Process Clause circumscribes a state court's power to exercise jurisdiction over a nonresident defendant. See, e.g., Ford, 141 S. Ct. at 1024; Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 918 (2011) ("A state court's assertion of jurisdiction exposes defendants to the State's coercive power, and

is therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause.").  At the most fundamental level, to be consistent with due process guarantees, there must be a sufficient connection between the defendant and the forum state so as to make it fair to require defense of the action in that forum.  See Int'l Shoe, 326 U.S. at 316.

While a state, by statute, may limit its jurisdiction over a nonresident defendant to particular circumstances, Tennessee's long-arm statutes authorize the courts of this state to exercise personal jurisdiction over a nonresident "[o]n any basis not inconsistent with the constitution of this state or of the United States."  Tenn. Code Ann. § 20-2-225(2) (2021); see also Tenn. Code Ann. § 20-2-214(a)(6) (2021).  Therefore, the inquiries under Tennessee statutory law and under relevant constitutional law collapse into one.  Crouch, 610 S.W.3d at 471 n.10; Sumatra, 403 S.W.3d at 740–41.

As we previously referenced, the general formulation of what due process requires is that a nonresident defendant have "certain minimum contacts" with a state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe, 326 U.S. at 316 (quoting Milliken, 311 U.S. at 463).  The analysis of whether the defendant's contacts with the state satisfy due process "cannot be simply mechanical or quantitative."  Id. at 319.  Instead, courts must look to "the quality and nature" of the defendant's activities.  Id.  Furthermore, this inquiry focuses not on the relationship between the defendant and the plaintiff or other persons residing in the forum state, but rather on the defendant's relationship to the forum state itself.  Bristol-Myers Squibb Co. v. Super. Ct., 582 U.S. 255, 262 (2017); First Cmty. Bank, 489 S.W.3d at 394.  The approach long has been that "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"  Keeton v. Hustler Mag., Inc., 465 U.S. 770, 775 (1984) (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

The focus on the relationship among the defendant, the forum state, and the litigation has led to the recognition of two subtypes of personal jurisdiction: general jurisdiction and specific jurisdiction.  See, e.g., Ford, 141 S. Ct. at 1024; Daimler AG v. Bauman, 571 U.S. 117, 126 (2014); Gordon, 300 S.W.3d at 647.  The nature and extent of the defendant's contacts with the forum state generally determine which subtype applies, and the subtype, in turn, determines the breadth of potential legal claims that may be brought against the defendant in that forum.  See, e.g., Ford, 141 S. Ct. at 1024.

A state court with general jurisdiction over a defendant has authority to hear "any and all claims" brought against that defendant, regardless of whether the claims relate to any of the defendant's activity in the state.  Id. (internal quotation marks omitted). Because of the breadth of available claims, the population of defendants over which a state may exercise general jurisdiction is narrow.  Id.  A state court may exercise general jurisdiction only when a defendant's affiliations with that state are so continuous and systematic as to

- 10 -

render it "essentially at home" in the state. Goodyear Dunlop, 564 U.S. at 919; see also Crouch, 610 S.W.3d at 472 n.11. The paradigmatic forums in which a corporation's contacts with a state render it essentially at home are its state of incorporation and its principal place of business. Daimler, 571 U.S. at 137. However, the United States Supreme Court has recognized the possibility of an exceptional case in which "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." Id. at 139 n.19.

In this appeal, the Plaintiff does not argue that the Defendant is subject to general jurisdiction in Tennessee.[14] Rather, the focus in this case is upon the existence of specific jurisdiction. A state may exercise specific jurisdiction over a defendant that is "less intimately connected with a State, but only as to a narrower class of claims." Ford, 141 S. Ct. at 1024. Specific jurisdiction is case-linked and has been characterized as limited to claims deriving from or connected with the controversy that establishes jurisdiction. See, e.g., Bristol-Myers, 582 U.S. at 262. As we previously referenced, the United States Supreme Court synthesized the guiding principle as follows: "In order for a state court to exercise specific jurisdiction, 'the *suit'* must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum.'*" Id. (alterations in original) (quoting Daimler, 571 U.S. at 127).

In addition, the United States Supreme Court long ago observed in the context of minimum contacts analysis that the defendant must take "some act by which [it] *purposefully avails* itself of the privilege of conducting activities within the forum [s]tate" for that state to exercise specific jurisdiction over the defendant. Hanson v. Denckla, 357 U.S. 235, 253 (1958) (emphasis added). The "purposeful availment" requirement is sometimes characterized differently depending on the context. For instance, in the tort context, courts often ask whether the defendant purposefully directed its activities at the forum state, whereas in the contract context, courts often ask whether the defendant purposefully availed itself of the privilege of conducting business or consummating a

---

[14] We note that the United States Supreme Court recently released an opinion involving an issue of consent to general jurisdiction. Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028 (2023). Of critical importance in the jurisdictional analysis in Mallory were the existence of certain Pennsylvania statutes and the fact that the nonresident corporate defendant had registered to do business in Pennsylvania with full notice of Pennsylvania law. Id. at 2037. Unlike Tennessee, Pennsylvania law explicitly provided that "'qualification as a foreign corporation' shall permit state courts to 'exercise general personal jurisdiction' over a registered foreign corporation, just as they can over domestic corporations." Id. (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(i) (2019)). In this case, the Plaintiff pointed out that the Defendant, in conjunction with the Bradley project, registered to do business in Tennessee and appointed a registered agent with a Tennessee address. The Court of Appeals considered these activities in its minimum contacts analysis, but the court's holding clearly looked to specific jurisdiction rather than general jurisdiction. See Baskin, 2022 WL 258631, at *5–7. In his brief in this Court, the Plaintiff makes clear that he argues for the existence of specific jurisdiction. Unlike Mallory, the Plaintiff makes no argument for general jurisdiction over the Defendant. Thus, this appeal does not require this Court to address Mallory and its impact, if any, on the subject of general jurisdiction in Tennessee.

transaction in the forum state. See, e.g., Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008). The concept of purposeful availment requires the defendant *itself* to have purposefully directed activities at or availed itself of the privilege of conducting activities in the forum state. Hanson, 357 U.S. at 253; Burger King, 471 U.S. at 472–76. Contacts with a forum state caused by the "unilateral activity of another party or a third person" are insufficient. Burger King, 471 U.S. at 475 (quoting Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 417 (1984)). Likewise, a nonresident defendant's "random," "fortuitous," or "attenuated" contacts are insufficiently deliberate to support specific jurisdiction. Id. (quoting Keeton, 465 U.S. at 774; World-Wide Volkswagen, 444 U.S. at 299). Moreover, courts must bear in mind that "the defendant's suit-related conduct must create a *substantial connection* with the forum [s]tate" to enable the exercise of specific jurisdiction. Walden v. Fiore, 571 U.S. 277, 284 (2014) (emphasis added); see also Burger King, 471 U.S. at 475. To that end, the purposeful availment concept ultimately requires that the defendant's conduct and connection with the forum state must be such that the defendant reasonably should anticipate being haled into court in that state. See, e.g., Burger King, 471 U.S. at 474–75; see also Crouch, 610 S.W.3d at 473.

As we previously referenced, the existence of purposeful minimum contacts does not end the jurisdictional inquiry. If the plaintiff has made a prima facie showing of a defendant's minimum contacts, the defendant may nevertheless "present a compelling case" that the exercise of specific jurisdiction would be unfair or unreasonable. Burger King, 471 U.S. at 477; see also Crouch, 610 S.W.3d at 485. In this respect, the court balances factors to determine reasonableness, including (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. See, e.g., Burger King, 471 U.S. at 476–77; Sumatra, 403 S.W.3d at 752. Of course, if the plaintiff has not made a prima facie showing of the defendant's minimum contacts with the forum state, this latter analysis is unnecessary.

### C. The Crouch Decision and the Defendant's Tennessee Contacts Associated with the Baskin Project

Most recently, we addressed the issue of specific jurisdiction in Crouch. The Court of Appeals looked to our decision in Crouch in analyzing the jurisdictional question in this case. Accordingly, we briefly will examine how we applied specific jurisdiction principles under the facts of Crouch.

Like the case at bar, Crouch involved a contractual dispute. 610 S.W.3d at 464. We observed that determining the validity of the exercise of specific jurisdiction can be particularly challenging in cases involving a single contract between a resident plaintiff and a nonresident defendant. Id. Nevertheless, we recognized that even "a single contract

- 12 -

can entail sufficiently meaningful contacts to allow for the exercise of personal jurisdiction." Id. at 479. However, it is clear that the mere existence of a contract between a resident of the forum state and a nonresident alone cannot establish minimum contacts for the exercise of specific jurisdiction. Burger King, 471 U.S. at 478. Instead, courts must examine the totality of the facts and circumstances surrounding a contract to determine whether the defendant's contacts with the forum state will make it amenable to personal jurisdiction there. See id. at 478–79; Crouch, 610 S.W.3d at 479. A contract itself is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Burger King, 471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 317 (1943)). Thus, to determine whether a nonresident purposefully established minimum contacts with the forum state in a contract-based action, the court must examine prior negotiations, contemplated future consequences, terms of the contract, and the parties' course of dealing. Id.; Crouch, 610 S.W.3d at 476.

In Crouch, we found Tennessee's exercise of specific jurisdiction constitutionally permissible. 610 S.W.3d at 486. We based our conclusion on an examination of both "the breadth and depth of the contractual relationship" and the quality of the acts associated with the relationship. Id. at 479; see also Calphalon Corp. v. Rowlette, 228 F.3d 718, 722 (6th Cir. 2000) (stating that "the *quality* rather than the *quantity* of the contacts is the proper subject of review"). Consistent with relevant constitutional principles, we examined: (1) whether the defendant's contacts resulted from "the defendant's own purposeful, deliberate actions directed toward [Tennessee]," Crouch, 610 S.W.3d at 473 (quoting First Cmty. Bank, 489 S.W.3d at 389), and (2) whether those contacts were sufficiently substantial to give rise to personal jurisdiction. Id. at 477.

We first concluded that the defendant's contacts with Tennessee resulted from its own purposeful, deliberate actions directed toward Tennessee even though none of the defendant's representatives ever physically entered the state. Crouch, 610 S.W.3d at 478. The defendant deliberately chose to enter into a contract with the plaintiff calling for the performance of custom professional services, knowing that the plaintiff was located in Tennessee and the services would occur primarily in Tennessee. Id. Throughout the duration of the contractual relationship and in conformance with expectations agreed upon in the contract, the defendant communicated with the Tennessee plaintiff. Id. Significantly, some of these communications were substantive "to aid accomplishing performance of the contract." Id. We concluded that the contacts were not the result of the unilateral activity of the plaintiff, nor were they random, fortuitous, or attenuated; rather, they were contemplated by both parties and undertaken by the defendant in direct furtherance of a business opportunity that it had entered into deliberately. Id. at 479.

We also concluded that the defendant's contacts with Tennessee, while not particularly extensive, were sufficiently substantial that the defendant "should reasonably anticipate being haled into a Tennessee court." Id. The contract expressly contemplated

- 13 -

an ongoing course of performance requiring the defendant to communicate with the plaintiff and fulfill "continuing obligations" connecting the defendant to the custom design work occurring in Tennessee. Id. at 481. Furthermore, the parties' actual conduct during the course of performance demonstrated the defendant's choice to comply with these obligations. Id. Of keen importance, the defendant's communications directed into Tennessee substantively supported the performance of services under the contract. Id. In effect, the defendant's contacts were a part of the custom design work occurring in Tennessee. Accordingly, we determined that the plaintiff had carried the burden of establishing a prima facie case of minimum contacts.[15]

In this case, the Court of Appeals concluded that "[t]he contacts and connections of [the] Defendant to Tennessee . . . are significantly more substantial than those of the defendant in Crouch." Baskin, 2022 WL 258631, at *6. With respect to the contract for the Baskin project in particular, the Court of Appeals noted that the construction plans for the Baskin project were created in Tennessee by a Tennessee firm, that some of the materials used in the construction came from Tennessee, and that the Defendant directed communications and invoices to the Plaintiff in Tennessee. Id. The Defendant takes issue with the conclusions of the Court of Appeals, arguing that its contacts with Tennessee were of low quality and largely the result of the Plaintiff's connections. We agree with the Defendant.

The record indicates that the Plaintiff hired a Tennessee architect to design the lake house, but the Defendant had no input or even contact with the architect. The Plaintiff simply gave the plans to the Defendant to execute in Alabama. Similarly, the record also indicates that the Plaintiff purchased lumber, tile, windows, and flooring in Tennessee, shipped the materials to Alabama, and paid the Defendant the contractor's fee on the materials. However, like the architectural plans, the Defendant played no role in selecting, procuring, or delivering the materials. Rather, the Defendant simply used the materials once they arrived in Alabama for construction of the lake house.

In our view, even though the Defendant knew of the Tennessee connection, these circumstances reflect attenuated contacts and the "unilateral activity of another party," Helicopteros, 466 U.S. at 417, rather than substantial, purposeful contacts with Tennessee by the Defendant. We do not believe the Defendant reasonably could anticipate being haled into a Tennessee court based on the Plaintiff's relationship with these Tennessee-based entities. See Walden, 571 U.S. at 284 (stating that courts have "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State"); First Cmty. Bank,

---

[15] Having concluded that the plaintiff set forth a prima facie case of minimum contacts, we next analyzed whether the exercise of jurisdiction would nonetheless be unreasonable or unfair. Crouch, 610 S.W.3d at 485. Concluding that it would be neither unreasonable nor unfair, we held the exercise of specific jurisdiction over the defendant in Tennessee was permissible. Id. at 486.

489 S.W.3d at 393 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting Burger King, 471 U.S. at 475)); 16 Moore's Fed. Prac.—Civil § 108.42[3][b][i], at 108-69 (3d ed. 2015) ("No matter how significant a plaintiff's contacts with the forum are, they cannot be decisive in determining whether the defendant's due process rights are violated.").

In addition, we do not agree with the Court of Appeals' assessment of the significance of the Defendant's directing communications and invoices to the Plaintiff in Tennessee. The record reflects that the Defendant chose to communicate with the Plaintiff in Tennessee throughout the project via phone calls, text messages, and emails. Such communications indeed may constitute purposeful contacts with Tennessee for purposes of specific jurisdiction analysis. See Crouch, 610 S.W.3d at 478 ("The transmission of information into a forum by way of email, telephone, or mail is unquestionably a contact for purposes of personal jurisdiction analysis."); see also Sawtelle v. Farrell, 70 F.3d 1381, 1389–90 (1st Cir. 1995). The Plaintiff argues that we found specific jurisdiction appropriate in Crouch based on the "communications flowing back and forth between the two States." However, the analysis was not so simple and did not stop there. We found specific jurisdiction appropriate in Crouch because the defendant engaged the plaintiff to provide custom design services from Tennessee that necessarily required the defendant's substantive communications directed into Tennessee, and the defendant made such communications to aid contractual performance occurring in Tennessee during the parties' course of dealing. Crouch, 610 S.W.3d at 481. The Plaintiff does not allege with reasonable particularity a similar nature or quality of communication by the Defendant in this case, nor does the record show anything of the sort. Thus, we view these contacts as far less substantial than those in Crouch. Likewise, the Defendant's contacts related to the invoices—sent to and paid from Tennessee—are equally insubstantial. The location from which a payment is made is "generally of little consequence to the payee and is a matter left to the discretion of the drawer," Helicopteros, 466 U.S. at 416–17, and is therefore inappropriate to justify specific jurisdiction over a nonresident defendant, cf. id. at 417.[16] Thus, we believe the Defendant's simple electronic transmission of invoices to the Plaintiff and the corresponding acceptance of the Plaintiff's wire transfers from Tennessee is of "negligible significance" in evaluating whether the Defendant had minimum contacts with Tennessee. Cf. id. at 416.

From our review, this case is quite different from Crouch. Obviously, both cases involve custom work pursuant to a contract. However, the custom design work in Crouch

---

[16] The record contains no indication that the Defendant for some particular reason requested payment specifically drawn from a Tennessee bank or that there were contractual negotiations between the parties with respect to the location or identity of the bank from which payment would be drawn. Cf. Helicopteros, 466 U.S. at 416.

- 15 -

took place in Tennessee, complete with substantive contribution from the defendant. In contrast, not only was the contract in this case consummated in Alabama, but the custom residential construction work—the conduct which forms the factual basis for the Plaintiff's claims—also took place entirely in Alabama. In evaluating the quality of forum contacts to determine whether a defendant has purposefully availed itself of the forum, the location of contractual services certainly is a factor. See Burger King, 471 U.S. at 476; see also Ford, 141 S. Ct. at 1025 (citing Walden, 571 U.S. at 285) (identifying "entering a contractual relationship centered" in the forum state as relevant to whether a defendant purposefully availed itself of the forum). Furthermore, as we previously described, the Defendant's contacts with Tennessee associated with the Baskin project—architectural plans, construction materials, communications, invoicing and payment—were of low quality. In our view, none of the aforementioned circumstances demonstrates that the Defendant purposefully availed itself of the privilege of conducting activities in Tennessee, and we do not believe that the Defendant's contacts were substantial enough for it reasonably to have anticipated being haled into Tennessee to defend against the Plaintiff's suit. Accordingly, we conclude that the Plaintiff failed to make a prima facie showing of minimum contacts to support the exercise of specific jurisdiction in Tennessee based on the Defendant's activities associated with the Baskin project.

### D. The Ford Decision and the Defendant's Tennessee Contacts Associated with the Cabin Project and the Bradley Project

In concluding that the Defendant had minimum contacts with Tennessee to support the exercise of specific jurisdiction, the Court of Appeals looked not only to the Defendant's contacts associated with the Baskin project, but also to the Defendant's contacts associated with the cabin project and the Bradley project. Baskin, 2022 WL 258631, at *6. In so doing, the Court of Appeals rejected the Defendant's contention that these contacts were insufficiently connected to the Plaintiff's claims to factor into the jurisdictional analysis. Id. at *8. Instead, looking to the decision of the United States Supreme Court in Ford, the intermediate appellate court concluded that the contacts were sufficiently "related to" the Plaintiff's suit to factor into the jurisdictional analysis because the "contracting and residential construction activities in Tennessee [were] of the same nature as those that occurred [on the Baskin project]." Id. In this Court, the Defendant maintains that these contacts did not "relate to" the Plaintiff's claims for injuries stemming from allegedly defective residential construction that took place entirely in Alabama. For his part, the Plaintiff argues that the Defendant's contacts associated with the cabin project and the Bradley project bear a sufficient affiliation with the suit because "they entail the same services (custom building) that gave rise to the Plaintiff's claim" and "represent the operation of the same line of business carried on with the same people and within the same general time frame as the activities over which the Plaintiff has sued." The Plaintiff asserts that these contacts, along with the Defendant's contacts associated with the Baskin project,

should be "assessed as part of a common set of reciprocal privileges and obligations." As explained below, we agree with the Defendant.[17]

The question of what constitutes a sufficient connection between a plaintiff's suit and a defendant's forum contacts for purposes of specific jurisdiction is not a new one. As early as the 1980s, the United States Supreme Court linked specific jurisdiction to those claims that arise out of or are related to a defendant's contacts with the forum state. See Helicopteros, 466 U.S. at 414 n.8. However, the Court provided little additional guidance for years, declining to decide clearly whether the terms "arise out of" and "relate to" describe "different connections between a cause of action and a defendant's contacts with a forum," much less "what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists." Id. at 415 n.10. Faced with cases that required decisions, lower federal courts and state courts were left to fill the void. Not surprisingly, several different approaches emerged to test what degree of connection between a plaintiff's claim and a defendant's contacts would support the exercise of specific jurisdiction.[18]

One approach was commonly known as the "substantive relevance" test. Generally speaking, the substantive relevance test looked to whether the defendant's contacts with the forum state were relevant to the merits of the plaintiff's claim. See O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 319 (3d Cir. 2007) (citing Lea Brilmayer, How Contacts Count: Due Process Limitations on State Court Jurisdiction, 1980 Sup. Ct. Rev. 77, 82–83). Some courts articulated this test in a slightly different way, asking whether the defendant's forum contacts were the "legal cause" of the plaintiff's injury. See id. at 318 (citing Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 35 (1st Cir. 1998)). In this way, the approach was sometimes referred to as the "proximate cause" test, but it was "essentially the same" as the substantive relevance test. See id. at 319 n.6 (quoting Mark M. Maloney, Note, Specific Jurisdiction and the "Arise from or Relate to" Requirement . . . What Does It Mean?, 50 Wash. & Lee L. Rev. 1265, 1283 (1993)).

Another approach was commonly known as the "but-for" test. Under this approach, a plaintiff's claim was sufficiently connected to a defendant's forum contacts if it would not have arisen in the absence of those activities. See id. at 319 (citing Shute v. Carnival Cruise Lines, 897 F.2d 377, 385–86 (9th Cir. 1990), rev'd on other grounds, 499 U.S. 585 (1991)).

---

[17] Because we agree with the Defendant in this regard, we need not address whether the Defendant's activities associated with the cabin project and the Bradley project reflect sufficient "purposeful availment" to support the exercise of specific jurisdiction in Tennessee. Likewise, we also need not address the Defendant's argument that the Court of Appeals erred by considering the Bradley project contacts at all, in that—according to the Defendant—any such contacts occurred *after* the accrual of the Plaintiff's claims.

[18] Even within what was ostensibly a single approach, different courts used different language depending on the facts of the individual case.

Still another approach was commonly known as the "substantial connection" test, sometimes referred to as the "discernible relationship" test. See id.; Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002) (requiring that a claim "have a substantial connection with the defendant's in-state activities"); Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 585 (Tex. 2007) (looking to the existence of a substantial connection between the nonresident defendant's forum contacts and the operative facts of the litigation). Under this approach, "[t]he critical question is whether the tie between the defendant's contacts and the plaintiff's claim is close enough to make jurisdiction fair and reasonable." O'Connor, 496 F.3d at 319.

Some courts adopted hybrid approaches. For instance, in O'Connor, the Third Circuit Court of Appeals articulated an approach that began with the but-for test but did not stop there. Id. at 322. The court supplemented the but-for test with an additional inquiry into whether there existed a "meaningful link . . . between a legal obligation that arose in the forum [by virtue of the defendant's activities there] and the substance of the plaintiffs' claims." Id. at 324. The court based its approach on the "tacit quid pro quo" a defendant should expect from conducting in-state activities—that is, in exchange for the protection of a forum's laws when engaging in activities in that forum, a defendant assumes certain obligations, among them amenability to suit connected with those activities. Id. at 322. Specific jurisdiction is appropriate when it "results from a contact closely tailored to that contact's accompanying substantive obligations." Id. at 323. The court characterized the necessary connection as looser than proximate cause but "intimate enough to keep the quid pro quo proportional and personal jurisdiction *reasonably foreseeable*." Id. (emphasis added); see also uBID, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 430 (7th Cir. 2010) (adopting same approach).

Foreseeability was a central concept in the hybrid approach articulated by the Oregon Supreme Court. See Robinson v. Harley-Davidson Motor Co., 316 P.3d 287 (Or. 2013) (en banc), abrogated by Cox v. HP Inc., 492 P.3d 1245 (Or. 2021) (en banc). The court purported to adopt the modified approach of the Third Circuit in O'Connor. Id. at 300. However, the court framed the approach as requiring first that the defendant's forum activity constitute a but-for cause of the litigation, and second that "the nature and quality of the activity . . . also be such that the litigation is reasonably foreseeable by the defendant." Id. In other words, the defendant's "particular [forum] activity must be a but-for cause of the litigation and provide a basis for an objective determination that the litigation was reasonably foreseeable." Id.

Suffice it to say that in the decades after the United States Supreme Court issued Helicopteros in 1984, the approach to determining whether a claim arose out of or was related to a defendant's forum contacts or activities was an area of the law in which "[t]he greys [were] dominant and even among them the shades [were] innumerable." Kulko, 436

U.S. at 92 (quoting Estin, 334 U.S. at 545).  It was against this backdrop that the Court issued its opinion in Ford in 2021.

Ford consisted of two consolidated products liability cases against global automobile manufacturer Ford Motor Company ("Ford").  141 S. Ct. at 1022.  The Court concluded that Ford's contacts with the forum states, although substantial, did not give rise to the plaintiffs' claims within the meaning of "arise out of" for purposes of specific jurisdiction.  Id. at 1022–23.  More specifically, although the plaintiffs alleged that Ford vehicles malfunctioned in the forum states, resulting in accidents and injuries, the plaintiffs' particular vehicles were neither designed, manufactured, nor first sold in the forum states.  Id.  Ford conceded that it had purposefully availed itself of the privilege of conducting business activities in the forum states, but it nonetheless argued that it should not be subject to specific jurisdiction based on in-state conduct that did not give rise to the plaintiffs' claims.  Id. at 1026.  Thus, the question became whether there was a basis for finding a sufficient connection between Ford's activities in the forum states and the plaintiffs' claims so as to allow for the exercise of specific jurisdiction.  Id. at 1022–24.

The Ford Court noted precedent that a defendant's contacts are sufficient to support specific jurisdiction when (1) they show purposeful availment of the forum state, and (2) the plaintiff's claim either "arise[s] out of or relate[s] to" the defendant's contacts with the forum.  Id. at 1025 (citing Bristol-Myers, 582 U.S. at 262); see generally 16 Moore's Fed. Prac.—Civil § 108.42[1], at 108-61 (3d ed. 2015) (articulating the general rule that specific jurisdiction requires a showing by the plaintiff that the nonresident defendant purposefully established significant—not random, fortuitous, or attenuated—contacts with the forum state and the plaintiff's cause of action arose out of or was related to the defendant's forum contacts).  The Court clarified that the "arise out of" language contemplates specific jurisdiction based on a causal connection between the defendant's in-state activities and the plaintiff's claim.  Ford, 141 S. Ct. at 1026.  However, the "relate to" language contemplates that some contacts support specific jurisdiction without a causal nexus between them and the plaintiff's claim, that is, without "proof that the plaintiff's claim came about because of the defendant's in-state conduct."  Id.

The Court ultimately rejected Ford's argument against the exercise of specific jurisdiction based on facts supporting "a strong 'relationship among the defendant, the forum, and the litigation,'" which it called "the 'essential foundation' of specific jurisdiction."  Id. at 1028 (quoting Helicopteros, 466 U.S. at 414).  The Court observed that Ford regularly conducted business in the forum states, including selling the very models of the vehicles at issue.  Id.  In addition, it advertised within the states "by every means imaginable."  Id.  It also fostered ongoing relationships with vehicle owners in the forum states by offering repair and maintenance services at dealerships and by distributing replacement parts there.  Id.  The defendant, the forums, and the litigation were connected through Ford's systematic service of a market in the states for the vehicles involved in the products liability suits in those states.  Id.

From our reading of Ford, the Court's analysis clarified that a strict causal nexus between a plaintiff's claim and the defendant's forum activities is not necessary for a state to exercise specific jurisdiction, but it did not identify with particularity the nature and quality of forum activities that sufficiently "relate to" a claim to allow for the exercise of specific jurisdiction. Rather, the Court emphasized the need for a "strong relationship" and cautioned that the availability of specific jurisdiction based on a defendant's contacts with the forum state that "relate to" the plaintiff's cause of action "does not mean anything goes." Id. at 1026. The lack of a clear rule was not lost on Justice Gorsuch, whose concurring opinion noted the lack of specific direction:

> For a case to "relate to" the defendant's forum contacts, the majority says, it is enough if an "affiliation" or "relationship" or "connection" exists between them. But what does this assortment of nouns *mean*? . . . The majority promises that its new test "does not mean anything goes," but that hardly tells us what does.

Id. at 1034–35 (Gorsuch, J., concurring) (citation omitted). Of course, specific jurisdiction is an area of the law where the Court has been reticent to draw bright lines. See Kulko, 436 U.S. at 92 (noting that few answers in the minimum contacts analysis will be written in black and white).

In Ford, the Court did not explicitly adopt any of the approaches that other courts had developed over the preceding years. However, the language used by the Court effectively did abrogate any approach that required a causal connection. See, e.g., Estate of Logan v. Busch, 574 F. Supp. 3d 660, 672–73 (W.D. Mo. 2021) (indicating that the explication of the "related to" aspect of specific jurisdiction in Ford undercut the application of a standard requiring the but-for or proximate-cause tests). This circumstance necessarily begs the question of how persuasive even those approaches not requiring a causal connection remain after Ford. Courts no doubt will wrestle with that question as cases arise.[19] For our purposes today, however, because we are bound in this area of federal constitutional law only by the jurisprudence of the United States Supreme Court, see Crouch, 610 S.W.3d at 471, we will look primarily to Ford to glean the principles required to resolve this appeal.[20]

---

[19] Indeed, in light of Ford, the Oregon Supreme Court revisited its combination but-for/foreseeability approach that we previously described. See Cox, 492 P.3d at 1255–56. The court disavowed its previous requirement of a but-for link in *every* case, while maintaining its focus on whether a defendant's "Oregon activities provide a basis for an objective determination that the litigation was reasonably foreseeable." Id. at 1256 (internal quotation marks omitted).

[20] By looking to these principles, we find it unnecessary to adopt a particular approach.

Based on our reading, there are two important aspects of Ford that aid resolution of this appeal.  First, Ford offered a comparative example of circumstances in which the exercise of specific jurisdiction based on "related" contacts was constitutionally permissible.  With that aspect in mind, we have no hesitation concluding that the circumstances of this case clearly are not at all comparable to those of Ford.  In Ford, the Court approved of the exercise of specific jurisdiction based on a litany of extensive activities in the forum states that were related to the plaintiffs' claims.  141 S. Ct. at 1028.  The plaintiffs' claims stemmed from car accidents that occurred in the forum states involving two models of Ford vehicles, which the plaintiffs alleged were defective.  Id.  Ford "advertised, sold, and serviced" the very models of cars at issue in the plaintiffs' claims "for many years" in the forum states.  Id.  Indeed, Ford advertised by "every means imaginable," sold the car models at dozens of dealerships in each forum state, and "regularly" maintained and repaired cars, even after their warranties had expired.  Id.

In marked contrast, the Plaintiff's claims in this case stem from allegedly shoddy residential construction that occurred in Alabama, and the Defendant's Tennessee contacts associated with the cabin project and the Bradley project were not remotely as "continuous[] and deliberate[]" as those in Ford.  Id. at 1027 (quoting Keeton, 465 U.S. at 781).  To put it simply, this case is nothing like Ford.  Of course, the Court did not purport to set a constitutional floor based on the circumstances in Ford.  As a result, we will dig deeper than a simple factual comparison to determine whether Tennessee may exercise specific jurisdiction in this case.

The second important aspect of Ford is its reaffirmation of longstanding principles that the Court repeatedly has noted in the context of specific jurisdiction.  Chief among them is the notion that a nonresident defendant must have "fair warning" for the exercise of specific jurisdiction to comport with due process guarantees.  Id. at 1025 (quoting Burger King, 471 U.S. at 472) (citing World-Wide Volkswagen, 444 U.S. at 297 (referring to "clear notice")).  This principle, undisturbed by Ford, holds that it is critical for the proper exercise of specific jurisdiction "that the defendant's conduct and *connection with the forum State* are such that he should reasonably anticipate being haled into court there."  Burger King, 471 U.S. at 474 (emphasis added) (citing World-Wide Volkswagen, 444 U.S. at 297).  Indeed, to explain "why Ford [was] subject to jurisdiction," Ford, 141 S. Ct. at 1028, the Court pointed out that Ford "had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States," id., and concluded that those forum contacts were such that Ford reasonably should have anticipated being haled into the forums' courts to defend actions that alleged Ford's products had caused injury there, id. at 1027 (citing Burger King, 471 U.S. at 472–73; Keeton, 465 U.S. at 781; World-Wide Volkswagen, 444 U.S. at 297–98).

In this case, then, the Defendant's Tennessee contacts or activities associated with the cabin project and the Bradley project "relate to" the Plaintiff's claims when there exists a sufficiently "strong relationship" among the Defendant, those Tennessee contacts or

- 21 -

activities, and the litigation. <u>Id.</u> at 1028. In assessing that relationship, we must bear in mind the fundamental jurisdictional principle that unless the Defendant—in making those contacts or conducting those activities—reasonably should have anticipated being haled into court to defend the Plaintiff's litigation, the contacts or activities hardly can be said to "relate to" the Plaintiff's claims.

The record reflects that the extent of the Defendant's contact with Tennessee as to the cabin project was hiring an Alabama-based mobile-home-moving company to load and transport a cabin from Tennessee to Alabama, at which point the Defendant would perform typical construction work. In furtherance of that process, two individuals affiliated with the Defendant visited the cabin site in Tennessee no more than three times. The record does not reveal the extent of the visits, but it does not establish that the visits were very significant. The record does not reveal exactly when the move occurred, other than before the Baskin project. The record also does not reveal how involved the moving process was, but it does not establish that it was a lengthy one. Thus, so far as the record shows, the Defendant's Tennessee contacts in this regard are that, at some point in the three years between corporate formation in 2013 and the Baskin project in 2016, the Defendant took a job in which it hired an Alabama company to perform a likely short-lived project that involved transporting a cabin on a tractor-trailer from Tennessee to Alabama.

The Defendant's Tennessee contacts associated with the Bradley project obviously are more extensive than those associated with the cabin project. The Defendant, or subcontractors the Defendant brought from Alabama, performed typical residential construction work in Tennessee for the Bradley project. To accomplish that work, the Defendant secured a Tennessee contractor's license and registered as a foreign corporation authorized to do business in Tennessee, including appointing a registered agent (the company president and sole owner) using a Tennessee address. Thereafter, the Defendant updated its website to reflect that it was licensed in Tennessee as well as Alabama. The project itself went on for approximately a year and a half, beginning in 2018 roughly about the time the Defendant's work on the Baskin project was scheduled to conclude and ending shortly after the Plaintiff filed suit in 2020. Moreover, the project entailed multiple visits by the Defendant's personnel to Tennessee. Nevertheless, the record reflects that it was the only project of its kind that the Defendant has undertaken in Tennessee since its formation in 2013. The Defendant's Tennessee contractor's license and business registration lapsed during the course of the project. Although the Defendant's president testified that he would be open to renewing the license and registration, the record suggests that it would take another Tennessee-based project to prompt that course of action.

In our view, these circumstances reflect a minor and insignificant relationship among the Defendant, the cabin-project and Bradley-project contacts with Tennessee, and the Plaintiff's litigation. The record does not show that the Defendant's cabin-project and Bradley-project contacts were "instrumental either in the formation of the contract or its [alleged] breach." <u>Vapotherm, Inc. v. Santiago</u>, 38 F.4th 252, 258–59 (1st Cir. 2022)

- 22 -

(quoting Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007)).  Nor does the record establish that these contacts would "bear on the substantive legal dispute between the parties or inform the court [or jury] regarding the economic substance of the contract." RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1278 (7th Cir. 1997).  Additionally, the record does not suggest that the outcome of the Plaintiff's suit is likely to turn on any facts developed from the Defendant's cabin-project or Bradley-project contacts.  See id. at 1279. In evaluating the Defendant's Tennessee contacts, the Court of Appeals placed significance on the fact that the Defendant, in association with the Bradley project, updated its website to reflect its licensure in Tennessee.[21]  Baskin, 2022 WL 258631, at *6 ("Defendant reached out to Tennessee residents through its website, which stated that it was 'licensed in Alabama and Tennessee.'").  However, the record indicates that this passive website generated no Tennessee-based projects for the Defendant, much less had any connection with the Baskin project and the Plaintiff's claims.  In short, from our reading of the record, the operative facts surrounding the Plaintiff's claims do not appear to be even marginally related to the Defendant's Tennessee contacts associated with the cabin project and the Bradley project.  Cf. Rush v. Savchuk, 444 U.S. 320, 329 (1980) (finding no *quasi in rem* jurisdiction in part because the defendant's forum contacts were neither "the subject matter of the case" nor "related to the operative facts of the negligence action").  As a result, the Defendant's contacts with Tennessee, even taken in the aggregate, in no way constitute a systematic and substantial service of the Tennessee market such as that found in Ford.  See Ford, 141 S. Ct. at 1028.

Importantly, in Ford, the United States Supreme Court also was careful to warn that its standard for when a plaintiff's claim "relates to" a defendant's forum contacts "incorporates real limits" and "does not mean anything goes."  141 S. Ct. at 1026.  Based on our reading of Ford, we agree with the Oregon Supreme Court's point that to satisfy the standard, at a minimum, the nature and quality of a defendant's forum contacts must permit a determination that it was reasonably foreseeable that the defendant could be haled into the forum state to answer the claim at issue in the plaintiff's suit.  See Cox, 492 P.3d at 1257.  In other words, potential defendants should not be surprised by the jurisdictional consequences of their forum activities.

Thus, we are called upon in this appeal to assess whether the nature and quality of the Defendant's activities associated with the cabin project and the Bradley project were such that it reasonably should have anticipated being haled into a Tennessee court to defend an action asserting breach of contract and breach of warranty stemming from the construction of a lake house in Alabama pursuant to a contract with a Tennessee resident. For the reasons detailed above, we have determined that the nature and extent of those activities were not such that it was reasonably foreseeable that the Defendant could be sued

---

[21] We note that the mere mention of having a license in the forum state is far from the systematic and substantial contacts in Ford, where the defendant entered the forum states through extensive advertising and selling.  See Ford, 141 S. Ct. at 1022.

in Tennessee for the allegedly shoddy residential construction work it provided to the Plaintiff in Alabama.  Accordingly, we conclude that the Defendant's Tennessee activities associated with the cabin project and the Bradley project were not sufficiently related to the Plaintiff's claims to support the exercise of specific jurisdiction over the Defendant in this case.

We do not doubt that the Defendant's Tennessee contacts associated with the Bradley project in particular were meaningful.  Nevertheless, even when a defendant has meaningful ties to a forum, if they do not connect sufficiently to the plaintiff's claim, they cannot sustain the power of the courts of the forum state to hear that claim.  See Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 317–18 (5th Cir. 2021).  Based on our review of the record, we have determined that the Defendant's Tennessee contacts associated with the cabin project and the Bradley project were not "related to" the Plaintiff's claims concerning the Baskin project.  Absent that affiliation, specific jurisdiction is lacking regardless of the extent of the Defendant's unconnected activities in Tennessee.  See Bristol-Myers, 582 U.S. at 264 (citing Goodyear Dunlop, 564 U.S. at 931 n.6).

### III. CONCLUSION

Tennessee law provides that a plaintiff bears the ultimate burden of demonstrating that the trial court properly may exercise personal jurisdiction over a defendant.  Gordon, 300 S.W.3d at 643.  For the foregoing reasons, we hold that the Plaintiff failed to establish a prima facie case of the minimum contacts necessary for a Tennessee court to exercise specific personal jurisdiction over the Defendant as to the Plaintiff's claims.  Therefore, we reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court dismissing this action.

The costs of this appeal are taxed to the Plaintiff, Roger Baskin, for which execution may issue.

_____
JEFFREY S. BIVINS, JUSTICE